[No. D041783. Fourth Dist., Div. One. Nov. 12, 2003.]

GLOBAL MINERALS & METALS CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
NATIONAL METALS, INC. et al., Real Parties in Interest.

**COUNSEL**

Loeb & Loeb, Daniel G. Murphy; Cadwalader, Wickersham & Taft, H. Peter Haveles, Stacey Lara, and Jason Jurgens for Petitioner.

No appearance for Respondent.

Krause & Kalfayan, James C. Krause, and Eric J. Benink for Real Parties in Interest.

## Opinion

**HUFFMAN, Acting P. J.**—The trial court certified this Cartwright Act case as a class action involving class members who are residents of 19 different states. (Bus. & Prof. Code, § 16700 et seq.)[1] The moving party plaintiff was National Metals, Inc. (National Metals or Plaintiff), a large-scale copper purchaser. Both this action and a companion action (*Heliotrope v. J. P. Morgan* (Super. Ct. San Diego County, No. GIC749280)) were brought by such copper purchasers against numerous defendants (as pertinent here, Defendant and petitioner Global Minerals & Metals Corporation (GMMC) and Defendants and petitioners J. P. Morgan & Co., Incorporated et al. (J. P. Morgan), sometimes collectively Defendants.)[2] Plaintiffs' theory in both actions is that these defendants have manipulated the price of copper on the London Metals Exchange (LME) and on the American copper futures exchange, COMEX, through combinations in restraint of trade in violation of the Cartwright Act and through conspiracies to do so, to the detriment of copper purchasers in their private transactions on the physical or cash copper markets, as represented by the putative class representatives.

Defendant and petitioner GMMC contends the trial court made an incomplete and erroneous analysis of the factors relevant to certification. We agree and conclude the certification order must be vacated, as the record does not support a finding of sufficient community of interest and ascertainability among the putative class members, due to the existence of potential conflicts of interest among them, and due to a lack of showing of predominating common questions of law and fact regarding proof of fact of any classwide injury.

---

[1] All further statutory references are to the Business and Professions Code unless noted. Section 16720 defines an unlawful trust as, inter alia, "a combination of capital, skill or acts by two or more persons for any of the following purposes: (a) To create or carry out restrictions in trade or commerce. (b) To limit or reduce the production, or increase the price of merchandise or of any commodity. (c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity. . . ."

[2] In addition to the named defendant and petitioner GMMC, defendant J. P. Morgan and its codefendants Morgan Guaranty Trust Company of New York and Chase Manhattan Bank (the related defendants) are named in this National Metals complaint (referred to collectively as J. P. Morgan). Plaintiff alleges J. P. Morgan are financiers who participated in the alleged restraint of trade in the copper market. GMMC is a copper merchant company.

In the companion action, *Heliotrope*, there are also pending writ proceedings in this court, brought by J. P. Morgan to challenge the same class certification order. (*J. P. Morgan & Co., Incorporated et al. v. Superior Court*, D041791.) Here, GMMC joins in the J. P. Morgan arguments in that writ matter. Conversely, J. P. Morgan joins in the GMMC arguments.

## BACKGROUND

### A

### The Copper Trading Industry and Earlier Related Actions

We first describe several related actions. In 1996, Heliotrope brought its original, similar class action complaint in this jurisdiction on allegations of price-fixing and antitrust violations in the copper market. (*Heliotrope v. Sumitomo et al.* (Super. Ct. San Diego County, 1996, No. 701679) (the prior action).) This prior action was heavily litigated and on October 10, 1997, Superior Court Judge Arthur Jones denied certification of the class, without prejudice. At that time, the court found that the proposed class was "unmanageable due to the degree of complexity in applying the laws of nineteen different states." Judge Jones retired and these related actions were assigned to Judge J. Michael Bollman.

The prior action, as well as a related action and others in different jurisdictions, were settled, and Sumitomo and other defendants, such as Merrill Lynch, paid millions of dollars into a settlement fund, on which claims were made by various consumers of copper product and scrap/recycled copper product.[3] Plaintiff's counsel represented to the trial court the settlement amounts exceed $75 million; in the opposition brief, it is stated five settlements have been reached, amounting to $83 million. Those background facts are argued for their relevancy to the class definition issue.

In June 2000, Heliotrope filed the companion action as an amended class action complaint for antitrust violations against a number of defendants, including J. P. Morgan and its related defendants. (*Heliotrope General Inc. v. Credit Lyonnais Rouse, Ltd. et al.* (Super. Ct. San Diego County, 1996, No. GIC749280).) It follows up on the original Heliotrope action but has a different class definition and more defendants. A number of defendants have settled that Heliotrope action, including GMMC. The remaining defendants, J. P. Morgan and its related defendants, are the only petitioners in that companion writ proceeding, D041791. (See fn. 2, *ante*.)

---

[3] The prior action, No. 701679, and a related action, No. 701680 (*R.W. Strang Mechanical Corporation et al. v. Sumitomo*), resulted in large settlements by Sumitomo and Merrill Lynch (approximately $31 million). There were 2,429 approved claims for copper product purchases and 712 for scrap/recycled copper purchases. A related federal action was settled and was administered by the same claims administrator.

B

Current Action

The present action is brought by National Metals against Sumitomo and GMMC (Super. Ct. San Diego County, 1996, No. GIC734001). GMMC remains a defendant in this action, based on its alleged actions as a copper merchant company that operated in Sumitomo's name in mineral trading transactions that were allegedly manipulative and artificially inflated the world price of copper. GMMC had an LME licensed warehouse located in Long Beach, California, for a short period towards the end of the 1993–1996 proposed class period, and its employees controlled and supervised $50 million in copper warrants and 20,000 metric tons of copper shipments through that area.

J. P. Morgan and its two related defendants remain as parties defendant in both actions. (See fn. 2, *ante.*) Numerous other defendants have settled in both current actions. The complaint includes reference to the multimillion-dollar settlements made in the prior actions, from which payments have been made to various claimants.

Essentially, the plaintiff in the current *National Metals* action seeks to represent purchasers of copper product that is scrap or recycled (the SCP Class), while in the companion *Heliotrope* case, that plaintiff seeks to represent purchasers of nonscrap/recycled copper product (the CP Class). In all these actions, the subject purchases are alleged to have taken place between January 1, 1993, and May 31, 1996. The proposed classes of plaintiffs consist of businesses and individuals who are active purchasers of copper products or scrap/recycled copper products, as defined below, and who are residents of one of the 19 states, listed in the motion as recognizing indirect purchaser standing to sue for antitrust damages, in this proposed multistate class action.[4]

As described in the petition, Plaintiffs are alleging a antitrust conspiracy to inflate the price of physical copper over a three-year period. Their causation theory consists of the following: (1) defendants conspired to manipulate the LME, causing an artificial inflation of prices; (2) this artificial inflation of prices on the LME caused an artificial inflation of prices upon the COMEX; (3) this artificial inflation of futures prices upon the COMEX caused an artificial inflation of prices in the various cash physical and scrap copper

---

[4] The 19 states of residence of the proposed class members are designated by the term "included states" as meaning California, Alabama, Arizona, the District of Columbia, Florida, Kansas, Louisiana, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, West Virginia and Wisconsin.

markets around the United States; (4) such that class members were injured when they paid artificially inflated prices for physical copper.

## C

### The Motion and Opposition

In their motions in both of these companion actions, Plaintiffs sought an order naming two classes of copper purchasers defined as follows:

"All persons or entities who, between June 1, 1993 and May 31, 1996 inclusive, purchased any Copper Product[5] (as defined below) for use in any trade or business or for resale (and not for personal use), and who at the time of such purchase (1) resided in any of the Included States[6] (as defined below); (2) purchased any Copper Product from a Person who was a resident of any Included State; or (3) purchased any Copper Product for delivery in any Included State (the 'CP Class')"; and "all persons or entities who, between June 1, 1993 and May 31, 1996 inclusive, purchased any Scrap or Recycled Copper Product[7] (as defined below) for use in any trade or business or for resale (and not for personal use) and who at the time of such purchase (1) resided in any of the Included States (as defined below); (2) purchased any Scrap or Recycled Copper Product from a Person who was a resident of any Included State; or (3) purchased any Scrap or Recycled Copper Product for delivery in any Included State (the 'SCP Class')."[8]

Plaintiffs' motions were made on the grounds that these two classes were sufficiently ascertainable, and there was a well-defined community of interest

---

[5] As defined in the motion, " 'Copper Product' means any of the following copper products: (i) smelter and refinery feed and output, including, but not limited to, copper concentrate, matte, blister and anode, cathode, continuous cast rod, wire bar, ingot, billet, and cake; copper wire mill fabricated items, including, but not limited to, copper wire and cable, bar and insulated copper wire, magnet wire and power cable; copper mill fabricated products, including but not limited to, sheet, strip, coil and extruded shapes, plumbing tube, thin wall tube, foil, sections, pipes, slabs, plates, fittings, forgings or powder consisting of refined copper or high copper alloys; or (ii) any product consisting of a copper content of 80 percent or more."

[6] See footnote 4, *ante*.

[7] As defined in the motion, " 'Scrap or Recycled Copper Product' means any of the following scrap or recycled copper products: (i) smelter and refinery feed and output, including, but not limited to, copper concentrate, matte, blister and anode, cathode, continuous cast rod, wire bar, ingot, billet, and cake; copper wire mill fabricated items, including, but not limited to, copper wire and cable, bar and insulated copper wire, magnet wire and power cable; copper mill fabricated products, including but not limited to, sheet, strip, coil and extruded shapes, plumbing tube, thin wall tube, foil, sections, pipes, slabs, plates, fittings, forgings or powder consisting of refined copper or high copper alloys; or (ii) any product consisting of a copper content of 80 percent or more."

[8] The motion states, "Excluded from the Copper Product Class and Scrap or Recycled Copper Product Class are all Defendants and any subsidiary, affiliate, or current or former officer, director or employee of Defendants and any government entity."

in questions of law and fact among the members of the two classes. Plaintiffs argued that certifying the cases as class actions was a manageable and efficient way of proceeding with this action. Heliotrope was the proposed representative of the CP Class, and National Metals was the proposed representative of the SCP Class. However, both motions defined and requested certification of both classes, but it is not disputed that Heliotrope is primarily representing copper product purchasers, while National Metals is primarily representing scrap and recycled copper product dealers.

In addition, Plaintiffs argued that certifying the cases as class actions was appropriate, because the classes were so large that joinder of all class members was impracticable. Specifically, Plaintiffs contended that based on the information gained in the settlements in the previous actions, there were at least 2,429 members of the copper products class (Heliotrope) and at least 712 members of the scrap and recycled copper products class identified to date. Additionally, there was evidence of thousands of additional members of both classes who had yet to be identified.

Further, Plaintiffs argued there were questions of law or fact common to each member of the classes, and these common questions predominated over any questions affecting only individual members of the classes, such that class action status was a superior method of adjudicating the controversy. Plaintiffs contended they were proper representative plaintiffs.

In support of the motions, Plaintiffs submitted expert evidence from three principal witnesses. Plaintiffs' expert economist and professor of finance, Dr. Alex Kane, rendered his opinion that a common impact on each member of the proposed copper product class can be demonstrated by showing, through data analysis and certain assumptions, that as a result of Defendants' manipulation of the copper markets, the purchasers were charged supra-competitive prices for copper products, and the amount of damages is susceptible to common proof.

Next, Plaintiffs submitted evidence from Dennis Gilardi, the claims administrator of the previously settled matters, stating that based on his experience in the related cases, the class members are identifiable and manageable. Gilardi had taken in claim forms, built a database of the information and processed that information according to the terms of the settlement, involving billions of dollars' worth of claims. There were 2,429 members of the copper products class in the settled matters, with submitted claims reflecting a total purchase amount of copper products by the class of $20 billion. In the related settlement matter, regarding the scrap and recycled copper products class, there were 712 claims made by class members, reflecting purchases of scrap and recycled copper products in the amount of $8.8 billion.

Next, Plaintiffs' expert, Andrew Novak, opined that a notification program can be designed and implemented to reach members of the copper product class and the scrap copper product class.

In support of their reply papers, Plaintiffs also relied on a prior ruling issued by the trial court in the *National Metals* case, denying an individualized summary judgment motion by Defendant GMMC. There, the trial court had found in July 2002 that there were triable issues of fact as to several issues in this case: Whether there were sufficient contacts of the plaintiff, National Metals, with California to justify the application of California antitrust law, and whether the damages allegedly sustained by National Metals in dealing with GMMC should be measured by the final price paid for the scrap copper, or by the overpayment of the copper component of that price stemming from antitrust violations. In that summary judgment ruling, the trial court found that damages could be calculated by determining the amount of copper in the scrap purchased by that plaintiff, and there remained triable issues of fact about whether all of the increases in the price of the copper were passed on to customers of that plaintiff.

Extensive opposition was filed by Defendants to both class certification motions, chiefly arguing that the proposed classes were overbroad and unascertainable, and there were inherent and unavoidable conflicts among the proposed class members. This was due to the nature of the copper marketing business, in which various participants acted at various times as buyers or sellers. According to GMMC, there are at least eight levels of distribution and consumption of scrap/recycled copper buyers, including manufacturers, scrap dealers, refiners, fabricators and semi-fabricators, wholesalers, traders, and retailers. There is a multitiered vertical and horizontal chain of distribution, and various copper purchasers combine one or more levels of the distribution network in their operations. Discovery conducted from putative class members showed that when scrap copper is purchased, such individually negotiated contracts may be affected by various factors, such as the identity of the supplier, product, and transaction, the size and timing of the purchase, payment, and delivery, and additional costs such as labor, handling, and transportation. Prices paid on the physical or cash copper markets are affected by these factors, as well as by the futures prices established on the LME and COMEX. Also, copper purchasers used various forms of price protections, such as hedging, to avoid exposure to market price fluctuations.

Additionally, Defendants argued there were material conflicts of law among the 19 included states from which the putative class members would be drawn, so as to present problems that would preclude litigation in the form of a multistate class action. Defendants also strenuously argued that it was not possible to use classwide common proofs or mathematical techniques to

establish whether the alleged price manipulation on the LME and then on the COMEX resulted in higher prices paid by individual class members, but rather that individual analyses will be required for each proposed class member. Such individual analyses of causation, injury, and damages were argued to be criteria indicating that the court lacked the ability to certify the class. Reply papers were filed and oral argument held.

D

Order After Hearing on Motions for Class Certification

The trial court granted the Plaintiffs' motions for class certification. (Code Civ. Proc., § 382.) The court found the current class definition was sufficiently precise so that the class was ascertainable and manageable and therefore, California law may be properly applied, as follows: "The present class definition is restricted to the purchasers of [scrap/recycled] copper products with more than 80 percent copper and certain enumerated products."[9]

With respect to Plaintiffs' burden to identify the potential class members, the court found the three experts' declarations adequately showed that the class is ascertainable, manageable, and notice can properly be given to the proposed class members. Discussing the evidence from Dennis Gilardi, the claims administrator, the trial court stated that it was a significant fact "that thousands of claims [in settlement funds] based upon the definition of copper products substantially similar to this proposed definition have been effectively processed without objection. The fact that some claims may have slipped through the administrative process should not defeat the proposed definition of class products."

With respect to the economist, Dr. Kane's, evidence, the trial court noted that it was not disputed that Dr. Kane had assumed causation of injury for purposes of his analysis. The trial court found it significant that at Dr. Kane's deposition, the Defendants did not provide Dr. Kane with a definition of causation. Accordingly, the trial court found, "Dr. Kane's report reflects that if plaintiff proves the conspiracy caused a rise in the LME price of copper, then it follows that this illegal activity caused a price increase to the purchasers of copper products. The report indicates there is a correlation between manipulations and resulting damages. . . . 'Copper prices on the LME and COMEX move, unambiguously, in near-perfect lock step.' . . . This is

---

[9] This conclusion by the trial court reflects the alternative definitions provided for in the class of scrap/recycled copper purchasers, of which the 80 percent copper content product is one, and the listed products are another. Please see footnote 7, *ante.*

sufficient to show causation." It was also found significant that the Plaintiffs' expert Novak opined that notice could be adequately provided to putative class members.

Regarding the defense evidence presented, the trial court found unpersuasive Defendants' argument that copper products are extremely varied in nature and there are substantial differences in the factors affecting buying and selling. The court found such challenges go to the weight of the evidence, and should be resolved at trial, rather than in a motion to certify the class. The ruling stated, "Although a trial court must conduct rigorous analysis to ensure that the prerequisites of class certification is met, a motion for class certification is not an occasion for examination of the merits of the case and the court should not delve into the merits of an expert's opinion. [Citation.]"

Further, the trial court rejected Defendants' argument there were variations in the laws between California and the additional included states that were so complex as to render the proposed classes unmanageable. The trial court reasoned, "As set forth in this court's final ruling of September 3, 2002, regarding defendant Global's motion for summary judgment, Global had significant contacts with California involving its employees that controlled and supervised $50 million in copper warrants and 20,000 metric tons of copper shipments to and from the London Metals Exchange ("LME") licensed warehouse located in Long Beach, California. Global participated, traveled to, and negotiated a significant number of complex transactions that involved ties to California. Even with the limited period of time after the warehouse opened in 1995, the court found those contacts significant, and ruled that applying California choice of law provisions was neither arbitrary or unfair. [Citation.] . . . Plaintiff's causes of action are based upon conspiracy. The court's reasoning on Global's motion for summary judgment applies equally here. California law may be applied and since there is no state that has a greater interest in having its laws applied, there is no undue complexity and no conflict of laws."

The trial court further found that Plaintiffs had successfully established that the number of members is so large that joinder is impractical, and there was a sufficient "community of interest due to common questions of fact and law which predominate, including 1) whether defendants have manipulated the price of copper on the LME and COMEX through combinations in restraint of trade in violation of the Cartwright Act; 2) whether defendants conspired to manipulate the price of copper on the LME and COMEX to the detriment of copper purchasers represented by the class action (fact of injury or causation in an antitrust case is a common issue that predominates over individual claims); and 3) whether damages may be awarded based on a defendant's aggregate overcharge without proof that each class member was

overcharged. The need for individual calculation of damages does not preclude class certification. Where illegal horizontal price fixing combinations are alleged, questions of law or fact predominate over questions affecting only individual members. [Citation.]"

The trial court further found that Plaintiffs' claims are typical of the claims of the class, and Plaintiffs will fairly and adequately represent the class, and current counsel would be appointed to represent the class. Accordingly, in both related actions, the court granted Plaintiffs' motions to certify the class. GMMC brought this petition to challenge the ruling.

## DISCUSSION

### I

#### *Class Certification Standards*

##### A

##### General Class Action Rules

" 'Section 382 of the Code of Civil Procedure authorizes class suits in California when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." The burden is on the party seeking certification to establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citation.]' " (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1103–1104 [131 Cal.Rptr.2d 1, 63 P.3d 913] (*Lockheed Martin*).)

As outlined in *Lockheed Martin,* the class certification question is " 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' [Citation.] 'The community of interest requirement [for class certification] embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.] Plaintiffs acknowledge it is their burden to establish the requisite community of interest and that 'the proponent of certification must show, inter alia, that questions of law or fact common to the class predominate over the questions affecting the individual members.' [Citation.]" (*Lockheed Martin, supra,* 29 Cal.4th at p. 1104.) A proponent of class certification must also demonstrate that the proposed class is manageable. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922 [103 Cal.Rptr.2d 320, 15 P.3d 1071] (*Washington Mutual*).)

When a plaintiff is seeking to show the requisite community of interest for class action treatment, some inquiry into the merits of that particular issue must be made, even though in general, the class certification question is " 'essentially a procedural one.' " (*Lockheed Martin, supra,* 29 Cal.4th at p. 1104; *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 656 [22 Cal.Rptr.2d 419].) " '[T]he issue of community of interest is determined on the merits and the plaintiff must establish the community as a matter of fact.' [Citation.] A ' ". . . class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " ' [Citations.] In sum, the fact some evidence relevant to a class action determination may have been relevant also to the merits of the lawsuit did not preclude the court from considering such evidence at the hearing on [the plaintiffs'] motion for class certification." (*Ibid.*)

B

Rules Regarding Ascertainability of Class

Under Code of Civil Procedure section 382, the plaintiff must show there is an ascertainable class, as well as a well-defined community of interest in questions of law and fact among the members of that class. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1270–1271 [242 Cal.Rptr. 339] (*Reyes.*) "Whether a class is ascertainable is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying class members. [Citations.]" (*Id.* at p. 1271.) A related inquiry is manageability of the proposed class: "Manageability within this context is intertwined not only with the question of ascertainability, but also the underlying admonishment the Supreme Court has given the trial courts to carefully weigh the respective benefits and burdens of a class action and to permit its maintenance only where substantial benefits will be accrued by both litigants and the courts alike." (*Id.* at p. 1275.)

C

Appellate Review of Certification Order

" 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' [Citation.] Nevertheless, 'we must examine the trial court's reasons for [granting] class certification.' [Citations.] In particular, we must consider whether the record contains substantial evidence to support the trial court's predominance finding, as a certification ruling not supported by substantial evidence cannot stand. [Citation.]" (*Lockheed Martin, supra,* 29 Cal.4th at p. 1106.) However, an order certifying a class

can be found defective even where there may be substantial evidence to support it, because " 'an order based upon improper criteria or incorrect assumptions calls for reversal.' " (*Washington Mutual, supra*, 24 Cal.4th at p. 914.)

Accordingly, Plaintiff's burden on moving for class certification requires a showing that common issues exist, and also that substantial evidence exists to show that these common issues predominate. (*Washington Mutual, supra*, 24 Cal.4th at p. 913.) " '[T]his means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants." ' [Citation.]" (*Lockheed Martin, supra*, 24 Cal.4th at p. 1108.)

Further, in *Washington Mutual, supra*, 24 Cal.4th at pages 928 to 929, the court noted that determinations regarding the applicable law chiefly affect the issues of predominance of common issues and manageability. Conflict of laws issues also affect the community of interest requirement for multistate class certification in other ways, such as "whether the representative plaintiffs have claims or defenses typical of those of the class or whether the representative plaintiffs can fairly and adequately protect the interests of the entire class. On a final note, we caution trial courts that determinations of predominance and manageability may vary case by case, depending upon individual factors such as the number and nature of the legal theories and evidentiary issues presented in the case, as well as the size and scope of the proposed class." (*Ibid.*)

## II

### Analysis of Order Granting Class Certification

■ As already stated, the class action proponent will bear the burden of establishing the propriety of class certification, and this burden primarily requires a demonstration of predominance of common issues of law and fact, and manageability of the proposed class. (*Washington Mutual, supra*, 24 Cal.4th at p. 922.) Both GMMC here and J. P. Morgan, in the companion writ proceedings, seek to show the trial court erred in analyzing a major issue concerning the identity of the proposed class members, i.e., whether they have significant conflicts of interest that would interfere with class certification. We address this issue first (pt. IIA, *post*), and then turn to the other major argument raised by both GMMC and J. P. Morgan, concerning the problems of proof of fact of injury, and whether any classwide injury can be demonstrated, for purposes of review of the class certification order. (Pt. IIB, *post*.)

Finally, we will focus on the argument raised in the GMMC petition concerning whether an ascertainable class can be readily and accurately identified. (Pt. IIC, *post*.)

A

Conflicts of Interest May Interfere With Class Certification

In order to be deemed an adequate class representative, the class action proponent must show it has claims or defenses that are typical of the class, and it can adequately represent the class. This is part of the community of interest requirement. (*Lockheed Martin, supra*, 29 Cal.4th at p. 1104.) Where there is a conflict that goes to the " 'very subject matter of the litigation,' " it will defeat a party's claim of class representative status. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) Thus, a finding of adequate representation will not be appropriate if the proposed class representative's interests are antagonistic to the remainder of the class. (*In re Seagate Tech. II Securities Litigation* (N.D. Cal. 1994) 843 F.Supp. 1341, 1346–1347.) "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." (*Amchem Products, Inc. v. Windsor* (1997) 521 U.S. 591, 625 [138 L.Ed.2d 689, 117 S.Ct. 2231].) " '[A] class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.' [Citations.] To assure 'adequate' representation, the class representative's personal claim must not be inconsistent with the claims of other members of the class. [Citation.]" (*In re Beer Distribution Antitrust Litigation* (1998) 188 F.R.D. 549, 554.) In that case, a showing of intraclass conflicts among a proposed class of plaintiff custom beer brewers was found to justify a denial of class certification where unfair competition by an industry leader and distributor was alleged. The court noted, "Plaintiffs and the proposed class members vigorously compete with one another for distribution of their beer products. Distributors cannot service every brand of beer. Competition for the distribution services of beer distributors results in a conflict that goes to the merits of this litigation. [Citation.]" (*Ibid.*)

When a court decides a proposed class certification request, to consider issues of adequacy and fairness of representation, it will evaluate "the seriousness and extent of conflicts involved compared to the importance of issues uniting the class; the alternatives to class representation available; . . . the procedures available to limit and prevent unfairness; and any other facts bearing on the fairness with which the absent class member is represented." (*Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 910, fn. omitted.) Although the trial court has discretion to make such a determination, its order certifying a class must not be based upon improper criteria or incorrect assumptions. (*Washington Mutual, supra*, 24 Cal.4th at p. 914.)

In *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1351 [235 Cal.Rptr. 228] (*B.W.I. Custom Kitchen*) the court addressed the issue of when a proposed class is able to prove on a generalized basis that the defendants' overcharges or inflated prices were "passed-on" to them. The issue before the court was, "Whether the necessity of tracing a price-fixed product through the chain of distribution presents such complex individual issues that injury cannot be proven on a class-wide basis is the issue most vigorously contested herein." (*Ibid.*) The court noted that it was an unresolved issue in California whether a defendant in a Cartwright Act suit should be able to assert a "pass-on defense," (i.e., that any overcharges that it caused to a plaintiff by selling a product did not cause lasting injury, because the plaintiff then passed on any losses to the next purchaser of the product). The court's language was, "Whether defendants can bar class certification or negate injury by showing plaintiff and the class 'passed on' the overcharge is a question that has not been addressed by any California court, and it would be premature to resolve it at this juncture because we do not have an adequate factual record. However, even if a plaintiff has passed on the entire overcharge, he or she is not per se precluded from otherwise proving injury. For example, even though the entire overcharge has been passed on, the plaintiff may have lost a percentage share of the market or otherwise suffered reduced sales." (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1353, interpreting *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720 [52 L.Ed.2d 707, 97 S.Ct. 2061].)[10]

With these considerations in mind, we turn to the parties' respective showings about the nature of the putative class members' interests in recovering damages under the Cartwright Act. According to GMMC, as the petitioner, there are serious and extensive conflicts of interest among the proposed class members which outweigh the issues that they have in common. ■ Specifically, the nature of the copper distribution chain is that the entities involved routinely buy and sell among each other, in different capacities in different transactions. The class certified currently includes copper and/or scrap/recycled copper producers, fabricators and semi-fabricators, manufacturers, retailers, traders, and scrap merchants. The ruling states that "the present class definition is restricted to the purchasers of copper products with more than 80 percent copper and certain enumerated

---

[10] It should be noted that this issue of the availability of a "pass-on defense" in antitrust law still remains an open question in California, at least according to the only case that has cited to *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d 1341, on this point, *Basurco v. 21st Century Ins. Co.* (2003) 108 Cal.App.4th 110, 120 [133 Cal.Rptr.2d 367]. At this class certification stage of the action, we need not address this issue on the merits. However, we will also be referring to it in part IIB, *post*, as it arises in the context of whether the proponents of the class have made an adequate showing that they can prove classwide injury as indirect purchasers of copper products or scrap/recycled copper products. (See also *In re Methionine Antitrust Litigation* (2001) 204 F.R.D. 161, 166.)

products." However, evidence was presented that the same lot of copper may change hands several times among the businesses involved. The proposed class does not consist of a single distribution level whose members all bought from the same supplier. (See *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1352.) Rather, depending on whether each putative class member was acting as a buyer or a seller in a particular transaction, that plaintiff may have an interest in showing that, as a buyer, it paid an inflated price, but as a seller, it sold at a fair price, unaffected by any alleged price inflation. If each transaction within the three-year proposed class period will have to be analyzed individually at trial, that would make class certification inappropriate. (*Lockheed Martin, supra,* 29 Cal.4th at p. 1108.)

■ Moreover, even if a purchaser of scrap/recycled copper suffered from an overcharge that was attributable to Defendants' anticompetitive behavior, there is a question whether any such overcharge was passed on to the next purchaser, such that the original purchaser would have recovered any losses when it disposed of the product. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at pp. 1351–1353.) Such a pass-on defense is not precluded by California law. (*Ibid.*) Also, where there is competition among the various proposed class members for the business of each other, their common interests may be outweighed by their individual interests. (*In re Beer Distribution Antitrust Litigation, supra,* 188 F.R.D. 549, 554; see *In re Methionine Antitrust Litigation, supra,* 204 F.R.D. 161, 165.) This may create conflicts of interest among them that would defeat class status.

In opposition, Plaintiff mainly argues that it was like any other consumer of a product who purchased the product at a price level that was inflated by anti-competitive behavior. Plaintiff also argues that any problems in damages analysis, such as duplicative damages, can be handled at the claims distribution stage of the proceedings, after the liability phase has been resolved. However, we think Plaintiff's arguments beg the real question, which is how much a proposed class member was affected by the alleged anticompetitive conduct, as a buyer from Defendants, for purposes of evaluating both liability for and the total amount of any damages sustained. It cannot be disregarded here that all class members commonly took different roles in different transactions, often concerning the same product. As stated in *Rosack v. Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 753 [182 Cal.Rptr. 800] (*Rosack*), for class certification purposes, if the plaintiff can establish a conspiracy to fix prices, and that it purchased the affected goods or services, the fact of injury or impact of the conspiracy can be treated as a common question. However, here, many different types of purchases and sales are alleged, so the issue of common interests is not so simple.

Thus, the difficulty here is in proving not only that there was a conspiracy to create the alleged price inflation, but also that it had maximum impact at

the moment when the proposed class members' actionable purchases were made. This was a complicated and multilevel business structure in which the proposed class members were operating, in both buyer and seller capacities, and over a long period of time. Although the trial court found such challenges should go to the weight of the evidence, and need not be resolved at the stage of a motion to certify the class, we think this analysis is incomplete, because the wide-ranging evidence presented of the nature of this industry made it impossible to overlook the potential conflicts between class members, even at the preliminary class certification stage. The factual showing made here in opposition to the motion undermines any finding that the necessary community of interest is present, for both liability and damages purposes. As stated in *Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th 644, 656, a class determination will generally involve considerations on the merits that are " ' "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." ' " (*Ibid.*) Such factors show that common issues do not predominate here. (*Blackie v. Barrack, supra*, 525 F.2d at p. 910.)

Accordingly, this record will only support a conclusion that the trial court abused its discretion in disregarding the evidence of a conflict of interest among the proposed class members that "goes to the very subject matter of the litigation." (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 470.) The petition is meritorious on this point.

### B

### Showing of Classwide Injury and Proof of Injury

■ To support a showing of community of interest among class members, the proponent of certification must show that questions of law or fact common to the class "predominate" over the questions affecting the individual members. (*Washington Mutual, supra*, 24 Cal.4th 906, 913–914.) "In essence, this means 'each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants.' [Citation.] A class action should be certified only if it will provide substantial benefits both to the courts and the litigants. [Citations.]" (*Ibid.*)

Here, the petition attacks the class certification order on the basis that the proposed class lacks the necessary community of interest on the subject of proving both the alleged antitrust violation and the resultant injury to plaintiffs, as a class. In *Rosack, supra*, 131 Cal.App.3d 741, 752, the proof of

injury requirement is also characterized as " ' "impact," "causation," "fact of damage," and "fact of injury," ' " and the court explained: " 'If plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable. [Citation.] If classwide proof of illegality and impact is not possible, the class must be decertified. [Citation.]' " (*Ibid.*)

In *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d 1341, the court noted that if classwide issues of antitrust violations and impact upon the class members may be resolved as common questions, then it is appropriate to treat the individual damages issues within the class action context. For example, a bifurcated trial, subclasses, or other remedial procedures could be used to make individual damage determinations. (*Id.* at p. 1354.) In some such cases, it is justified for courts to assume that "consumers were injured when they purchased products in an anticompetitive market, even though the price and terms of sale for the price-fixed product were individually negotiated." (*Id.* at pp. 1352–1353, citing *Rosack, supra,* 131 Cal.App.3d at pp. 759–760.) In the consumer context, at least a portion of the illegal overcharge by a manufacturer will presumably be passed on by the independent distributors to consumer class members in the form of higher prices. ▉ However, in a case in which the subject product was substantially altered or added to when it was received by a middleman from the manufacturer, the effects of any price-fixing by the manufacturer will be obscured and classwide proof of injury will be more difficult. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1352.) The latter facts fit this case more closely.

In *Lockheed Martin, supra,* 29 Cal.4th 1096, the Supreme Court found that even though some common issues had been demonstrated, the necessary showing of classwide proof of illegality and impact was lacking. (*Id.* at pp. 1106–1111.) There, the plaintiffs alleged the defendants' operations had negligently discharged dangerous chemicals that contaminated the city's drinking water with harmful toxins and that this contaminated water was used by a large portion of the city's residents. "Plaintiffs moved for certification of a 'medical monitoring' class defined as 'People who were exposed to water contaminated with any of [a long list of] chemicals' " over a certain period of time, in a certain area. (*Id.* at p. 1102.) The Supreme Court reversed the trial court's order certifying that class, and a punitive damages class, on the basis that the causation and damages issues raised by the plaintiffs' personal injury claims would have to be litigated individually, even if the matter were allowed to proceed on a class basis, because the necessary predominance of common issues of law and fact was missing. "The questions respecting each individual class member's right to recover that would remain following any

class judgment appear so numerous and substantial as to render any efficiencies attainable through joint trial of common issues insufficient, as a matter of law, to make a class action certified on such a basis advantageous to the judicial process and the litigants." (*Id.* at p. 1111.)

In this case, the trial court accepted Plaintiff's showing, based on the expert economist report by Dr. Kane, that causation of injury was established, because it was not disputed that Dr. Kane had assumed causation of injury for purposes of his analysis, and at his deposition. Defendants had not provided him with any other definition of causation. Accordingly, the trial court reasoned, "Dr. Kane's report reflects that if plaintiff proves the conspiracy caused a rise in the LME price of copper, then it follows that this illegal activity caused a price increase to the purchasers of copper products. The report indicates there is a correlation between manipulations and resulting damages. . . . 'Copper prices on the LME and COMEX move, unambiguously, in near-perfect lock step.' "

Also, in the trial court's ruling in the earlier summary judgment motion proceedings, it had noted that even though "some effort will be necessary in determining the level of copper in the scrap purchased by National Metals, damages can be reasonably calculated." Further, the trial court found National Metals had shown issues of material fact on whether all of the increases in the price of copper were passed on to its customers. Additionally, triable issues were found on whether the damages sustained by National Metals in dealing with GMMC should be measured by the final price paid for the scrap copper, or by the overpayment of the copper component of that price stemming from antitrust violations. However, since that motion was specific to National Metals and GMMC, those factual findings on those business practices were not broad enough to extend to all potential class members, so they are not adequately instructive on the class certification issue.

■ Overall, we think the analysis of causation by the trial court failed to account adequately for other evidence in the record that disputed whether a correlation between changes in copper futures prices on the LME and the COMEX will establish injury in fact to all the proposed class members on the cash market. Other than the assumption by the expert economist, there was no showing that changes in COMEX prices necessarily caused changes in prices in the physical or cash copper markets which, in turn, resulted in injury to the class members. The defense conducted discovery from a number of putative class members, and brought forth evidence that these merchants and buyers did not uniformly and predictably price their copper transactions solely on the COMEX prices. There were other factors involved, such as customer relationships, the use of different suppliers, or the purchase of different products. Unlike in the settlement classes in the related cases,

causation and liability are still in dispute here. The burden was on Plaintiff to show sufficient causation of injury to justify certifying the class as to both liability and damages, and it did not meet this burden. (*Rosack, supra,* 131 Cal.App.3d at p. 752.)

There was also evidence that to the extent that COMEX prices were used to set prices in the physical or cash copper market, class members relied on different COMEX prices, which included spot prices, daily closing prices, or forward prices. Some members of the proposed class used loss mitigation techniques, such as hedging, to protect against increases in copper prices, as well as passing on any inflated prices in subsequent resales. When the trial court merely relied on the expert evidence assuming causation of the fact of injury, it failed to account for these other legitimate factors in the record going toward whether classwide proof of injury could be accomplished. This evidentiary showing by the defense may support a pass-on defense, due to the factual showing of changes made in the products during the distribution chain, and the multiple roles played by the proposed class members. Therefore, this was not a case in which classwide proof of illegality and impact could readily be proved, such that individual damages issues should also be appropriately handled in the class action context. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at pp. 1351–1353.)

There is also a significant issue about whether the trial court's reasoning was justified that California law may be applied since there is no state of the numerous other included states that has a greater interest in having its laws applied. This issue is more fully addressed in our companion J. P. Morgan writ opinion (pt. IIC, *post*), but here it is enough to say that Plaintiff's showing of predominance of common questions of law and fact is unconvincing with respect to whether there are any material conflicts of law that should interfere with class certification. (*Washington Mutual, supra,* 24 Cal.4th at pp. 922–926.)

We conclude that the record does not support the trial court's exercise of discretion to certify this class, in light of the demonstrated proof problems and the class definition problems regarding the fact of classwide impact or injury from the alleged anticompetitive conduct. Many of the facts shown thus far appear to be relevant only to small groups of plaintiffs, such that class action treatment is not appropriate. (*Rosack, supra,* 131 Cal.App.3d at p. 752.) "The questions respecting each individual class member's right to recover that would remain following any class judgment appear so numerous and substantial as to render any efficiencies attainable through joint trial of common issues insufficient, as a matter of law, to make a class action certified on such a basis advantageous to the judicial process and the litigants." (*Lockheed Martin, supra,* 29 Cal.4th at p. 1111.)

C

Ascertainable Class Issues

GMMC also raises the ascertainable class issue in bringing its petition. As outlined above, the factors to be considered are "(1) the class definition, (2) the size of the class, and (3) the means available for identifying class members. [Citations.]" (*Reyes, supra*, 196 Cal.App.3d at p. 1271.) Closely related to the identification question is the manageability question. (*Id.* at p. 1275.)

In attempting to define an ascertainable class, the goal is to use terminology that will convey "sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent." (*In re Copper Antitrust Litigation* (2000) 196 F.R.D. 348, 359.) "Ascertainability is not a problem limited to the determination of damages so that it could be solved by decertifying the class after the questions of liability have been resolved. Rather, it goes to the heart of the question of class certification, which requires a class definition that is 'precise, objective and presently ascertainable.' [Citation.] Otherwise, it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating." (*Ibid.*)

In its ruling, the trial court stated, "The present class definition is restricted to the purchasers of [scrap/recycled] copper products with more than 80 percent copper and certain enumerated products." In reaching its ruling, the court relied in part on evidence from Dennis Gilardi, the claims administrator of the previously settled matters, stating that based on his experience in the related cases, the class members are identifiable and manageable. Gilardi stated there were 2,429 members of the copper products class in the settled matters (pure copper), and 712 claims made by class members, reflecting purchases of scrap and recycled copper products. The trial court found it significant "that thousands of claims [in settlement funds] based upon the definition of copper products substantially similar to this proposed definition have been effectively processed without objection. The fact that some claims may have slipped through the administrative process should not defeat the proposed definition of class products."

In its petition, GMMC argues the trial court erred in two ways in determining the class was ascertainable: It erroneously relied upon the declaration of the settlement administrator in the related settlement actions, and in any case, the proposed class definition was overbroad and ambiguous. We discuss these separately.

First, it is well established that trial courts should use different standards to determine the propriety of a settlement class, as opposed to a litigation class certification. Specifically, a lesser standard of scrutiny is used for settlement cases. (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1807, fn. 19 [56 Cal.Rptr.2d 483].) The reason for this is that no trial is anticipated in a settlement class case, so the case management issues inherent in the ascertainable class determination need not be confronted. (*Amchem Products, Inc. v. Windsor, supra,* 521 U.S. 591, 620.) Here, causation and liability remain in dispute at the class certification stage. Further, in this case, the claims administrator's declaration that he thought the class could be ascertained was inadequate to establish that, because his declaration did not establish his expertise in that area. (2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, §§ 46–47, pp. 297–299.)

Also in his deposition, the class administrator Gilardi stated that he had numerous proposed class members in the settlement cases call him and ask him if they were properly class members, and he had to consult Plaintiffs' counsel to determine whether a claim on the settlement fund was acceptable. These several factors weaken plaintiffs' showing that class certification was appropriate.

Moreover, the opposition provided by GMMC in the trial court pointed out that there were problems in the proposed class definition as to (a) who was covered ("all persons or entities who, between June 1, 1993 and May 31, 1996 inclusive, purchased any Scrap or Recycled Copper Product; for use in any trade or business or for resale (and not for personal use)"), (b) what products were covered (see fn. 7, *ante*), (c) when the transactions that would qualify for class treatment took place, and (d) where the place of residency of the proposed class members should be designated, regarding all the transactions among the residents of the numerous included states. Specifically, GMMC argued that (1) "the definition of scrap copper includes a seemingly endless list of products bought and sold at multiple levels of the distribution chain of copper;" (2) the class definition refers to residency of the class member and the seller at the time of the purchases, but does not state how this definition will be applied to businesses that operate in more than one state ("who at the time of such purchase . . . resided in any of the Included States (as defined below); . . . purchased any Scrap or Recycled Copper Product from a Person who was a resident of any Included State"); and (3) the class definition refers to delivery of the product in any included state, but does not specify whether delivery is deemed to exist at the point of origin or the point of destination, depending on how title was transferred ("purchased any Scrap or Recycled Copper Product for delivery in any Included State").

National Metals' only response to these objections is that the class definition is easy to understand, both as to the definition of scrap copper and

the terms "residency" and "delivery." We respectfully disagree, based upon our reading of the proposed class definition, in light of the broad terminology used, the three-year period of time covered, and the technical nature of the products described and the industry structure in which the proposed class members and Defendants operated. ■ The class definition is vague and overbroad as to size, identification of plaintiffs, the products covered, and the area and timing of the operations covered. (See fn. 7, *ante*.)

In conclusion, the trial court did not have an adequate basis in the record to exercise its discretion to determine that the proposed class was readily ascertainable and manageable as a means of litigating these claims. The petition is meritorious in this respect as well.

## DISPOSITION

Let a writ of mandate issue directing the trial court to vacate its order of class certification and to enter a new order denying the motion. Each party to bear its own costs.

Nares, J., and O'Rourke, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied February 24, 2004.