[No. D056206. Fourth Dist., Div. One. Oct. 29, 2010.]

RAYMUNDO B. SEVIDAL, Plaintiff and Appellant, v.
TARGET CORPORATION, Defendant and Respondent.

906

908

COUNSEL

Nicholas & Butler, Matthew B. Butler and Alex M. Tomasevic for Plaintiff and Appellant.

Morrison & Foerster, Miriam A. Vogel, David F. McDowell and Samantha P. Goodman for Defendant and Respondent.

OPINION

**HALLER, J.**—After purchasing three clothing items from Target Corporation's Web site that were misidentified as made in the United States, Raymundo B. Sevidal brought a class action against Target, alleging fraud and violation of unfair competition and false advertising laws, and seeking injunctive and restitutionary relief. Sevidal then moved to certify a class of California consumers who bought imported items from Target's Web site that were similarly misidentified. Sevidal argued that under the California Supreme Court's recent decision in *In re Tobacco II Cases* (2009) 46 Cal.4th 298 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*), the class could be certified on his unfair competition claim even if most of the proposed class members never relied on the "Made in USA" designation in deciding to make their online purchases.

The trial court agreed with Sevidal's interpretation of *Tobacco II* on the reliance element, but declined to certify the class because it found Sevidal did not meet his burden to establish other necessary elements of a class action, including that the proposed class was ascertainable. The court additionally

found the proposed class was overbroad because the evidence showed that most class members were never exposed to Target's online country-of-origin designation.

Sevidal appeals. We affirm. We determine the court properly refused to certify the class based on its finding the proposed class was not ascertainable. Substantial evidence supports the court's conclusion the absent class members could not be reasonably identified by reference to records or by common characteristics that would allow the class members to identify themselves. We also determine the court properly found the class was overbroad because the evidence shows the vast majority of absent class members never saw the Web page containing the alleged misrepresentation and thus were never exposed to the alleged wrongful conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

### Complaint and Class Allegations

In May and June 2007, Sevidal purchased three clothing items from Target's Web site—two pairs of running shorts and one necktie. Information on the Web site stated the items were made in the United States. However, when the items were delivered, Sevidal discovered the items had labels showing they were made outside the United States.

Sevidal sued Target claiming he had relied on the country-of-origin information in making the decision to purchase the items. Sevidal alleged several causes of action: (1) violation of California's unfair competition law (UCL) (Bus. & Prof. Code,[1] § 17200 et seq.); (2) violation of the false advertising law (FAL) (§ 17500 et seq.); (3) violation of the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.); (4) fraudulent concealment; and (5) unjust enrichment.

Sevidal sought to represent the class of persons who purchased imported goods from Target's Web site that were incorrectly identified as " 'Made in USA.' "[2] Sevidal alleged this class consists of "thousands of persons" and thus separate joinder would be impractical. Sevidal further alleged: common questions of law and fact predominate; Sevidal's claims "are typical of the claims of each member of the class"; Sevidal "has the same interest in this

---

[1] All further statutory references are to the Business and Professions Code unless otherwise specified.

[2] In the record, the parties use various terms to refer to the Web site's country-of-origin designation, including "Made in USA," "Made in US," and "Made in the USA." We use the particular designation employed by the party in the underlying document, even though these designations are not always consistent.

matter as all other members of the class"; and "[t]he prosecution of separate claims by each individual member of the class would create a risk of inconsistent or varying adjudications." Sevidal sought injunctive relief, monetary damages, restitution, and attorney fees on behalf of the class members.

Target responded by moving for an order denying class certification, based, in part, on its argument that individual questions would predominate because each class member would be required to establish individual reliance under Proposition 64's new UCL standing requirements.[3] Two months later, the California Supreme Court filed the *Tobacco II* decision, clarifying that with respect to the UCL, Proposition 64 standing requirements apply only to class representatives, and not to unnamed class members. (*Tobacco II, supra*, 46 Cal.4th at pp. 314–324.) Target then withdrew its motion to deny certification, but stated the dismissal was without prejudice to reasserting its motion in the future.

### *Sevidal's Class Certification Motion*

Sevidal then moved for an order certifying a class consisting of " 'any California consumer who purchased any product from Target.com on or after November 21, 2003 which was identified on Target.com as "Made in USA," when such product was actually not manufactured or assembled in the United States.' "

In support, Sevidal produced his declaration, stating: "On May 5, 2007 and on June 10, 2007, I purchased merchandise on the Target.com website. I purchased two pairs of . . . running shorts and one . . . necktie . . . all of which were identified on Target.com as 'Made in the USA.' [¶] . . . I relied on the representation that the merchandise was 'Made in the USA,' and purchased these items believing that the merchandise was made by American workers in the United States. Had the merchandise been labeled 'Imported' rather than 'Made in the USA,' I would have considered purchasing other similar merchandise labeled instead as 'Made in the USA.' [¶] . . . I am a military services member who has served in Iraq. It is important to me to purchase merchandise made by American workers because I want to repay the support that the American people have given me and my family. [¶] . . . I have since discovered that the merchandise that I purchased on Target.com was actually made outside of the United States, in China, Indonesia, and Jordan. [¶] . . . I believe that I would be an adequate class representative and would dutifully fulfill this role."

---

[3] On November 2, 2004, voters approved Proposition 64, which amended provisions of the UCL and the FAL, including standing requirements. (§§ 17200 et seq., 17203, 17204, 17500 et seq., 17535; see *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227–229 [46 Cal.Rptr.3d 57, 138 P.3d 207].)

Sevidal also submitted evidence produced by Target, in which Target acknowledged it had erroneously identified some imported items on its Web site as " 'Made in US.' " According to this evidence, Target found that a "computer bug" had inadvertently caused imported clothing items to be displayed as " 'Made in US' " at certain times, and at other times the same clothing item would be correctly identified as made outside the United States. This evidence showed Target discovered the problem in 2007, and by June 2008 Target had prepared and implemented a computer code change that eliminated the computer bug.

Sevidal also proffered an uncertified "rough" draft of a deposition transcript of Scott Affeldt, who is Target's "resident technical expert in applications and software design for item systems and item data." At his deposition, Affeldt initially testified that Target's error in mislabeling imported goods was "systematic" and agreed with Sevidal's counsel that it "seems reasonable" to conclude that these products were mislabeled from the time they were initially put on Target's Web site. However, three days after the deposition, Affeldt corrected this testimony based on his further investigation and clarified that the computer bug was triggered after an item had been published to the Web site. In the corrected and final version of the deposition, Affeldt testified that "it is *not* reasonable to assume that all items affected by the computer bug" had the incorrect designation when the items were first posted to the Web site. (Italics added.)

Sevidal also relied on his discovery request asking Target to identify *all* products advertised by Target as " 'MADE IN USA' during the four years preceding the filing of the complaint," and Target's responses in the form of hundreds of pages of spreadsheets, which identified thousands of product items that had been represented as " 'Made in USA,' " some of which were imported items.[4]

Based on this and other evidence, Sevidal argued he met the standards for class certification, including that the proposed class was identifiable and ascertainable, common questions of fact and law predominate, Sevidal's claims are typical of the class, and Sevidal and his counsel will adequately represent the interests of the class.

---

[4] As he did below, Sevidal asserts that in these spreadsheets Target identified 35,000 products that were *mis*identified. However, the trial court made a factual finding that this assertion was unsupported by the record, and that the items identified referred to all products at any time labeled " 'Made in the USA.' " Sevidal does not specifically challenge this evidentiary finding and thus waived any argument in this regard.

*Target's Opposition to Class Certification Motion*

Target opposed the motion on three primary grounds: (1) the proposed class is not ascertainable; (2) the proposed class is overbroad; and (3) common issues do not predominate because the claims require individualized factual inquiries.

In support of these arguments, Target presented evidence to explain the manner in which the country-of-origin information manifested on its Web site. This evidence was as follows. Target's Web site offers for sale many categories of consumer products and allows the customer to browse through items by selecting subcategory tabs or to conduct a keyword search for an item. Upon selecting a subcategory or running a keyword search, the customer is directed to a screen displaying small photos and brief descriptions of items. This screen does not state whether each product is " 'Made in US' " or imported. Some items can be purchased from this screen by clicking the "Add to Cart" button, which takes a customer to the purchase screen.

Alternatively, the customer can choose a particular item by clicking on the " 'View Details' " button or on the name of that item, which causes the customer to be directed to an item-specific screen that displays a picture of the item, its price, and a more detailed description. This item-specific screen does not state the product's country of origin, but it provides an option to select size, color, and quantity, and invites the customer to click on " 'Add to Cart' " to purchase that item. Toward the bottom of the item-specific screen, there are four tabs labeled: " 'Features', 'Reviews', 'Additional Info', and 'Shipping Info.' " To view the information on each of these tabs (except the " 'Features' " tab), the customer must physically click on the tab. If the customer clicks the optional " 'Additional Info' " tab, the customer will see a separate screen that describes the item as either being " 'Made in US' " or " 'Imported.' " This is the only screen that shows whether a product is identified as " 'Made in US' " or " 'Imported.' "

Thus, once the customer reaches the item-specific screen, the customer purchases the item by selecting the " 'Add to Cart' " icon after clicking the applicable quantity and size/color tabs. At this point, the customer will *not* have seen whether an item is identified as " 'Made in US' " or " 'Imported' " *unless* the customer chose to click on the optional " 'Additional Info' " tab for that item. As a result a customer can log onto Target.com and purchase an item without ever seeing whether it is identified as " 'Made in US' " or " 'Imported.' "

In 2007, Target discovered that some clothing items were erroneously identified as " 'Made in US' " on the " 'Additional Info' " pages on its Web

site. In 2008, Target's technical services department determined that this problem was caused by a computer bug in its programming language, which caused the country-of-origin attribute for some imported items to switch to " 'Made in US' " at various times. Target submitted a declaration of its technical computer expert (Affeldt), who stated that the bug was triggered when mass updates were made to any one of 200 attributes for "child" items in Target's computer software system, known as the PRISM system. In computer code language, a "parent" and "child" refer to an item and its attributes. For example, a "parent" is "[s]omething like a cardigan sweater" that "has multiple sizes, small, medium, large, extra large," each of which is a "child" item. There can be 200 child items for each parent item, and when any child item is changed, "the item changes are then propagated up to the parent." According to Affeldt, the country-of-origin computer bug problem manifested when a change was made to any one of the 200 child items for each parent item: "as [the computer system] is going through its comparison of each of the 200 fields, it comes to country of origin, it sees no change to country of origin, it treats it as null, it then—the [computer] logic assumed a default and made it United States." Affeldt additionally stated that the computer bug sometimes affected the same item multiple times: "Some items . . . could have alternated between being correctly designated as 'Imported' and erroneously designated as 'Made in US' on the Target.com website many times on various dates. . . ."

Affeldt also stated that "Target's item database PRISM does not maintain historical information about the country of origin attribute which controls whether an item is listed as 'Made in US' or 'Imported'. . . . Instead, PRISM only reflects the current or most recent country of origin designation for each item. . . . Moreover, [Target has] no other records or databases . . . [that] maintain such historical country of origin information. As a result, even if it is known that a particular item had a 'US' country of origin designation at one point in time, there is no way for Target to determine the beginning and ending dates that the item had a 'US' country of origin in PRISM and therefore on the Target.com website." According to Affeldt, Target was unable to obtain this information from any other source, including Amazon.com Inc. (Amazon), which provides the "web platform" for Target's Web site. Affeldt explained that he was told by Amazon personnel "it would be a significant effort for Amazon to pull such information and that the data provided would be incomplete and unreliable at best."

Target also produced evidence showing that the vast majority of customers do not select the " 'Additional Info' " icon before making a purchase and thus are never exposed to the product's country-of-origin designation. Jinzhou Huang, a Target employee whose responsibilities include analyzing Web services for Target, submitted her declaration stating that: "Prior to 2009, Target did not track or collect data regarding whether or how often customers

viewed the 'Additional Info' tab screen that indicates whether an item is 'Made in US' or 'Imported.' . . . [¶] . . . [¶] . . . Target [thus] has no record of whether specific customers who made purchases on Target.com between November of 2003 and January of 2009 ever viewed the 'Additional Info' tab prior to making a purchase. . . . [¶] . . . [¶] [However,] [b]eginning on February 13, 2009, Target formally implemented a new program that tracks the number of times visitors to the Target.com website click on the 'Additional Info' tab. [¶] . . . The data collected for the time period from February 13, 2009 to July 17, 2009 reflects that . . . the majority of customers do *not* click on the 'Additional Info' tab prior to making a purchase. [¶] . . . [¶] . . . The data collected . . . shows that . . . the 'Additional Info' tab was not clicked on at all during 80% of those sessions."

Huang also stated the data showing 20 percent of consumers select the " 'Additional Info' " icon does not necessarily show the customer purchased the item related to this information: "When a customer views more than one product during a session on Target.com, Target has no means to track for which of those products the customer viewed the 'Additional Info' tab. Consequently, it is not possible to identify whether the item purchased by the customer is the same item for which the customer viewed the 'Additional Info' tab during that session. [¶] . . . The data collected . . . shows that out of all the items purchased on Target.[c]om during that time period, <u>at most 17%</u> of the items could have been purchased after a viewing of the 'Additional Info' tab. This is because the number of total clicks on the 'Additional Info' tab between February 13, 2009 and July 17, 2009 is equal to only 17% of the total number of items purchased on Target.com during that same time period."

*Sevidal's Reply and Evidentiary Objections*

In reply, Sevidal reiterated his assertion that he has proposed an ascertainable and identifiable class "because the *deposition of Scott Affeldt* indicates that the products mislabeled 'Made in the USA' were so labeled from the moment they were placed onto Target.com's website. Thus, any California-based purchaser of these items is a member of the proposed class." (Italics added.) Sevidal further argued that under *Tobacco II, supra*, 46 Cal.4th 298, the putative class members need not have reviewed or relied on Target's misrepresentations.

In connection with these arguments, Sevidal filed evidentiary objections to certain statements made in the declarations of Affeldt and Huang. Specifically, Sevidal objected to Affeldt's statements that the PRISM computer bug did not cause a misidentification during the setup process, arguing that these statements contradicted Affeldt's deposition testimony that most items were

misrepresented from the time they were initially placed on Target's Web site. Sevidal also objected that Affeldt lacked personal knowledge to state the computer bug could cause a product's country-of-origin information to change several times. Sevidal additionally asserted several objections to Huang's declaration, including that Target did not produce sufficient information showing the basis of Huang's knowledge, Huang's statements were hearsay, and Huang's statements were not relevant because they improperly focused on a reliance concept.

### Court's Ruling

After a hearing, the court overruled Sevidal's evidentiary objections and denied Sevidal's class certification motion.

In its evidentiary rulings, the court found Huang's descriptions of her job responsibilities show she has personal knowledge of the subject of her declaration, her statements were not inadmissible hearsay, and her statements were relevant to the disputed issues. With respect to Affeldt's declaration, the court found no inconsistency between his declaration and deposition because the rough draft of the deposition produced by Sevidal had been corrected three days after the deposition based on reasonable postdeposition inquiry and research. The court stated it found credible Affeldt's declaration and corrected deposition answer that the computer bug was generally triggered only after the original item was published on the site, and not when the item was first uploaded to the Web site.

On the merits of the class certification motion, the court found Sevidal did not meet his burden to show various required elements of a class action, including an ascertainable class and that common questions of law and fact predominated over individualized issues. On the ascertainability issue, the court stated: "Class members are ascertainable only 'where they may be readily identified without unreasonable expense or time by reference to official records' . . . ," and "Target has no records that maintain the type of historical information as to when items may have been mislabeled," nor was Target able to reasonably obtain this information from other sources, including Amazon.

The court also found that Sevidal did not show common issues predominate over individual issues because it "is likely less than 17% of the proposed class ever viewed the erroneous 'Made in the USA' designation at issue but there is no way to identify them without asking each one of them individually." The court distinguished *Tobacco II, supra,* 46 Cal.4th 298, because that "ruling was made in the context of an 'extensive and long-term advertising campaign involving public health,' which is readily distinguishable from the

circumstances . . . [where] an incorrect 'Made in the USA' designation could only be a 'cause' of injury if the specific customer was actually exposed to that misstatement by viewing the 'Additional Info' web page before making a purchase."

For similar reasons, the court found that the proposed class was overbroad because it "includes every person who purchased an imported item during the time it was described as 'Made in the USA'—even if that person never saw the 'Made in the USA' description. While Target has no information about whether any specific customer viewed the 'Additional Info' tab that states whether the item is 'Made in the USA' or 'Imported' . . . , Target's statistical research shows the vast majority of Target.com customers do not view the 'Additional Info' page at all when making a purchase . . . ."

Sevidal appeals.

## DISCUSSION

### I. *Class Action Standards*

■ Code of Civil Procedure section 382 authorizes the maintenance of a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." In moving to certify a class, a plaintiff has the burden of showing the existence of an ascertainable class and a well-defined community of interest. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27].) "The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23]; see *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1287 [119 Cal.Rptr.2d 190].)

■ In ruling on a class certification motion, "the court should not make any determination of the merits or validity of the claim. [Citation.] But when the merits of the claim are enmeshed with class action requirements, the trial court must consider evidence bearing on the factual elements necessary to determine whether to certify the class. 'When the trial court determines the propriety of class action treatment, "the issue of community of interest is determined on the merits and the plaintiff must establish the community as a matter of fact." [Citation.]' " (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 829 [97 Cal.Rptr.2d 226].)

If a party's class certification motion depends on an evaluation of disputed factual evidence, we review the court's factual determinations under a substantial evidence standard. (See *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 328 [17 Cal.Rptr.3d 906, 96 P.3d 194]; *Massachusetts Mutual Life Ins. Co. v. Superior Court, supra*, 97 Cal.App.4th at pp. 1287–1288.) We do not reweigh the evidence and must draw all reasonable inferences supporting the court's order. (See *Caro v. Proctor & Gamble Co.* (1993) 18 Cal.App.4th 644, 655, fn. 6 [22 Cal.Rptr.2d 419].) Moreover, " '[b]ecause trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion' " in evaluating the relevant factors and in ruling on a class certification motion. (*Tobacco II, supra*, 46 Cal.4th at p. 311.) A " 'trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]." ' " (*Ibid.*) " 'Any valid pertinent reason stated will be sufficient to uphold the order.' " (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 436.)

In analyzing the trial court's class action ruling, we examine each alleged cause of action to determine whether it is appropriate for class treatment. With respect to the UCL and FAL claims, we are mindful that the California Supreme Court has specifically approved the use of the class action procedure to bring these claims if the statutory class action elements are satisfied. (*Tobacco II, supra*, 46 Cal.4th at pp. 312–313.) "[T]he UCL class action is a procedural device that enforces substantive law by aggregating many individual claims into a single claim, in compliance with Code of Civil Procedure section 382, to achieve the remedial goals [of the UCL consumer protection statutory scheme]." (*Id.* at p. 313.)

For the reasons explained below, we conclude the court did not abuse its discretion in concluding that the class was not ascertainable and was overbroad. Therefore, the court properly declined to certify the class.

## II. *Ascertainability Element*

A class representative has the burden to define an ascertainable class. (*Tobacco II, supra*, 46 Cal.4th at p. 318; *Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 435; *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836, 849 [7 Cal.Rptr.3d 28] (*Global Minerals*).) Although the representative is not required to identify individual class members (*Stephens v. Montgomery Ward* (1987) 193 Cal.App.3d 411, 419 [238 Cal.Rptr. 602]), he or she must describe the proposed class by specific and objective criteria. (*Global Minerals, supra*, 113 Cal.App.4th at p. 858.) Ascertainability is achieved " 'by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible . . . .' " (*Bomersheim v. Los Angeles Gay &*

*Lesbian Center* (2010) 184 Cal.App.4th 1471, 1483 [109 Cal.Rptr.3d 832]; see *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915 [107 Cal.Rptr.2d 761].) Thus, " ' " '[c]lass members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official [or business] records." ' " (*Bomersheim, supra,* 184 Cal.App.4th at p. 1480; see *Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1206 [76 Cal.Rptr.3d 804]; *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 135 [50 Cal.Rptr.3d 135] (*Aguiar*).)

■ " 'Ascertainability . . . goes to the heart of the question of class certification,' " and " 'requires a class definition that is "precise, objective and presently ascertainable." . . .' " (*Global Minerals, supra,* 113 Cal.App.4th at p. 858.) The purpose of the ascertainability requirement is to ensure it is possible " 'to give adequate notice to class members' " and " 'to determine after the litigation has concluded who is barred from relitigating.' " (*Ibid.*) The ascertainability requirement is satisfied if "the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation . . . ." (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 101 [82 Cal.Rptr.3d 1].)

■ In this case, the court made a factual finding that the class members could not be "readily identified" because Target did not maintain, or have access to, records identifying the individuals who purchased a product with an erroneous country-of-origin designation. Substantial evidence supports this conclusion.

Target presented evidence that it was unable to determine from its computer records the identity of the individuals who purchased an item when its country of origin was improperly designated. This evidence showed the computer bug causing the improper designation would not consistently misidentify the product's origin and the computer bug sometimes affected the same item more than once. As a result, some items could have alternated between being correctly designated as "Imported" and erroneously designated as "Made in US" on the Web site at multiple times on various dates. Thus, without knowing the exact dates and times that a particular item had a United States country-of-origin designation on the "Additional Info" page, Target could not identify those customers who purchased an imported item when it was incorrectly labeled on the Web site.

Challenging this conclusion, Sevidal contends his proposed class is ascertainable because "Target has already identified specific products which fall within this definition. . . . [Thus], ascertaining the members that fit within the

class definition is merely a matter of identifying the consumers who purchased those products." In support, Sevidal cites the portion of his memorandum of points and authorities submitted in the court below, in which he discussed the spreadsheets produced by Target during discovery and asserted that these documents show approximately 35,000 items were wrongly designated as " 'Made in the USA' " on its Web site.

This evidence does not support Sevidal's argument. As the trial court found, Target's spreadsheets did not reflect only the items which were *mis*identified or the dates on which a misidentification occurred: "Contrary to [Sevidal's] statement, 35,000 items were not misidentified. That number refers to all items that Target has been able to determine were ever described as 'Made in the USA' on its website." Moreover, the fact that certain products were misidentified does not provide a basis to determine *who* purchased those products. The court made a factual finding that Target could not make these identifications, and this finding was supported by the record.

Sevidal argues that "Target's own records will likely reveal the identity of class members" because "Target must have collected electronic billing information (such as credit card information) and shipping information (including names and addresses) from [its online] customers." However, the fact that Target may be able to identify consumers who purchased goods online would not provide the necessary information to determine the identity of the putative class members, i.e., those California consumers who purchased goods online that were misidentified *at the time of the purchase.*

██ Sevidal alternatively argues that his proposed class "is specific enough such that purchasers could identify themselves." We agree that a class is ascertainable for purposes of class certification "if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description." (*Bartold v. Glendale Federal Bank, supra,* 81 Cal.App.4th at p. 828; see *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1533 [87 Cal.Rptr.3d 518]; *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, 977 [84 Cal.Rptr.3d 532]; *Medrazo v. Honda of North Hollywood, supra,* 166 Cal.App.4th at p. 101.)[5]

However, there are no facts in the record showing Sevidal could meet this standard with respect to his proposed class. In the proceedings below, Sevidal made clear that only those who purchased an item *when the country of origin*

---

[5] Although the court did not specifically cite or discuss this standard in its minute order, as explained below the evidence was undisputed that Sevidal could not meet this standard. In any event, Sevidal did not identify this standard in the court below, and therefore he waived any right to assert error based on the court's failure to specifically discuss it in its minute order.

*was misidentified* are part of the proposed class. But he also defined the proposed class to include consumers who purchased an item from Target.com without selecting the " 'Additional Info' " icon, and thus who were never exposed to the country-of-origin information. These consumers would, by definition, have no way of knowing whether he or she purchased an item *when* it was misidentified, and thus would have no way of knowing whether he or she is a member of the class. And these individuals (those who would have no way of knowing he or she was a class member) represent a significant portion of the overall proposed class. Target's statistical evidence shows that approximately 80 percent of the proposed class falls within this category—individuals who purchased an item without viewing the country-of-origin information.

■ In this regard, the fact that Target can identify some consumers (such as Sevidal) who purchased goods when the goods were misidentified, does not mean the class as a whole was ascertainable. Courts have recognized that "class certification can be denied for lack of ascertainability when the proposed definition is overbroad and the plaintiff offers no means by which only those class members who have claims can be identified from those who should not be included in the class." (*Ghazaryan v. Diva Limousine, Ltd., supra,* 169 Cal.App.4th at p. 1533, fn. 8.) Although class certification should not be denied on overbreadth grounds when the class definition is only slightly overinclusive (*ibid.*; see *Aguiar, supra,* 144 Cal.App.4th at p. 136), in this case the overbreadth is significant. The unrefuted evidence showed that approximately 80 percent of the online purchasers did not select the " 'Additional Info' " icon and were never exposed to the alleged misrepresentation.

■ Sevidal additionally contends the court's ascertainability conclusion with respect to his UCL claim is inconsistent with *Tobacco II*'s holding that relief under the UCL is available to absent class members without individualized proof of reliance or injury. (*Tobacco II, supra,* 46 Cal.4th at p. 320.) However, the trial court's conclusion that Sevidal did not identify an ascertainable class was not based on the reliance issue. At the hearing on the motion, the court agreed with Sevidal that, after *Tobacco II,* a class may be certified without a showing that the unnamed class members individually relied on the misrepresentations. The court instead based its ruling on the manner in which Sevidal chose to broadly define the proposed class, the specific facts regarding how a product's country of origin was manifested on Target's Web site, and the absence of any records or other objective criteria to define and limit the class. These conclusions are fully consistent with *Tobacco II*'s holding that UCL claims brought as class actions remain subject to the statutory class certification rules, including the requirement that the plaintiff show an ascertainable class. (*Tobacco II, supra,* 46 Cal.4th at pp. 313, 318.)

We also reject Sevidal's suggestion that Target's failure to keep records of the country-of-origin information eliminates his burden to establish an ascertainable class. In support of this argument, Sevidal cites *Lee v. Dynamex, Inc.* (2008) 166 Cal.App.4th 1325 [83 Cal.Rptr.3d 241] (*Lee*) and *Aguiar, supra*, 144 Cal.App.4th 121, each of which was brought by the defendant's employees/independent contractors. These decisions are inapposite.

In *Lee*, the reviewing court found "the basic parameters" of the proposed class "can be readily ascertained through company records," and that subclasses could be used to identify factual differences among the members of the class or certain class members could be eliminated at a later time. (*Lee, supra*, 166 Cal.App.4th at p. 1334.) In *Aguiar*, the court found that the problem of identifying all class members could be resolved through payroll records and emphasized that because the defendant had a legal obligation to maintain proper records, the failure to do so would not preclude certification, particularly where it was possible for each class member to identify himself or herself as a member of the class. (*Aguiar, supra*, 144 Cal.App.4th at pp. 134–136.) The *Aguiar* court also stated that the few employees who were not part of the class definition could be eliminated from the class later in the litigation. (*Id.* at p. 136.)

This case is different. Unlike the defendant in *Aguiar*, Target had no contractual or statutory duty to maintain records pertaining to a consumer's selection of the " 'Additional Info' " icon. And unlike in *Aguiar* and *Lee*, the problem of identifying the class members was not merely a matter of creating subclasses or later eliminating a small portion of the class members.

In his reply brief, Sevidal makes several new arguments challenging the court's factual conclusion that Target does not have access to records identifying class members. Arguments made for the first time in a reply brief need not be considered. (*Cold Creek Compost, Inc. v. State Farm Fire & Casualty Co.* (2007) 156 Cal.App.4th 1469, 1486 [68 Cal.Rptr.3d 216].) Moreover, in these arguments, Sevidal is essentially asking us to reweigh the facts pertaining to the trial court's factual conclusion that these records do not exist, or they would be unreasonably burdensome and expensive to compile. However, we are required to affirm the court's factual conclusions if there is evidence to support the determinations. Target's evidence supports the trial court's conclusions.

The court did not abuse its discretion in concluding that Sevidal did not meet his burden to show the proposed class was ascertainable.

## III. *The Proposed Class Was Overbroad*

Although the court's ruling may be upheld based solely on the court's finding that Sevidal failed to propose an ascertainable class, we additionally conclude the court's order can be affirmed based on the evidence showing the proposed class was overbroad because a substantial portion of the class would have no right to recover on the asserted legal claims.

### A. *UCL and FAL Claims*

■ In his complaint, Sevidal alleged that Target's country-of-origin misrepresentations violated the UCL and FAL. The UCL prohibits unfair competition, which is defined as "any unlawful, unfair or fraudulent business act or practice . . . ." (§ 17200.) Sevidal claimed Target's conduct constituted an unlawful and fraudulent business practice. ■ The "unlawful act" allegation was based on section 17533.7, which prohibits a seller from offering a product that states it is made in the United States if it was manufactured or produced outside of the country.[6] ■ The FAL similarly prohibits misleading or deceptive advertising. (§ 17500.) Sevidal alleged Target's conduct violated the FAL because the " 'Made in US' " representation was misleading and deceptive.

■ Sevidal sought primarily monetary relief on behalf of all class members under the UCL and FAL. Although a party is not entitled to damages under these statutes, a court has the authority to award monetary relief in the form of restitution "as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (§ 17203; see § 17535.)

■ Historically, the UCL and FAL authorized relief notwithstanding any lack of proof of injury or damages. (See *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1359 [108 Cal.Rptr.3d 682].) The statutes "only required a showing that ' "members of the public [were] *likely to be deceived*." . . .' . . . Allegations of actual deception, reasonable reliance and damage were unnecessary." (*Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 630 [105 Cal.Rptr.3d 795], citations omitted (*Pfizer*); see *Tobacco II, supra*, 46 Cal.4th at pp. 312, 320.) However, in November 2004, the voters approved Proposition 64, which provided that " 'a private person has standing to sue only if he or she "has suffered injury in fact and has lost

---

[6] Section 17533.7 states: "It is unlawful . . . to sell or offer for sale in this State any merchandise on which merchandise or on its container there appears the words 'Made in U.S.A.,' 'Made in America,' 'U.S.A.,' or similar words when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States."

money or property as a result of such unfair competition." [Citations.]' [Citation.]" (*Tobacco II, supra*, 46 Cal.4th at p. 314.)

In *Tobacco II*, the California Supreme Court held that this new standing requirement applied only to the class representatives, and not to absent class members. (*Tobacco II, supra*, 46 Cal.4th at p. 306.) In so concluding, the court emphasized the language in section 17203 that parties are entitled to restitution " 'to restore to any person in interest any money or property, real or personal, which *may have been acquired*' (italics added) by means of the unfair practice . . . ." (*Tobacco II*, at p. 320.) The court stated that "to hold that the absent class members on whose behalf a private UCL action is prosecuted must show on an individual basis that they have 'lost money or property as a result of the unfair competition' . . . would conflict with [this] language in section 17203 authorizing broader relief—the 'may have been acquired' language—and implicitly overrule a fundamental holding in our previous decisions . . . . Had this been the intention of the drafters of Proposition 64—to limit the availability of class actions under the UCL only to those absent class members who met Proposition 64's standing requirements—presumably they would have amended section 17203 to reflect this intention. Plainly they did not." (*Ibid.*, citation omitted.)

But the *Tobacco II* court did not state or suggest there are *no* substantive limits on absent class members seeking restitution when a defendant has engaged in an alleged unlawful or unfair business practice. Instead, the court recognized that under the UCL's statutory language, a person is entitled to restitution for money or property "*which may have been acquired*" by means of the unfair or unlawful practice. (§ 17203, italics added; see *Tobacco II, supra*, 46 Cal.4th at p. 320.) Although this standard focuses on the defendant's conduct and is substantially less stringent than a reliance or "but for" causation test, it is not meaningless. To conclude otherwise would violate the statutory interpretation principle that every word in a statute must be given operative effect. Even after the *Tobacco II* decision, the UCL and FAL still require some connection between the defendant's alleged improper conduct and the unnamed class members who seek restitutionary relief.

A Court of Appeal recently interpreted *Tobacco II* in this precise manner. (*Pfizer, supra*, 182 Cal.App.4th 622.) In that case, the plaintiff alleged Pfizer advertised and promoted its mouthwash product, Listerine, in a misleading manner by indicating that Listerine can replace dental floss in reducing plaque and gingivitis. (*Id.* at p. 625.) The plaintiff brought a class action and asserted numerous claims, including violations of the UCL and FAL. (182 Cal.App.4th at p. 625.) The trial court certified a class of " 'all persons who purchased Listerine, in California, from June 2004 through January 7,

2005.' " (*Id.* at p. 626.) After the Court of Appeal granted Pfizer's writ petition, the California Supreme Court granted review in the case, and then, after it decided *Tobacco II*, the high court transferred the matter back to the appellate court with directions to reconsider the matter in light of *Tobacco II*. (*Pfizer, supra,* at p. 628.)

Upon reconsideration, the *Pfizer* court again concluded the class was overbroad and granted the petition. (*Pfizer, supra,* 182 Cal.App.4th at p. 625.) In so concluding, the court noted that *Tobacco II* had unequivocally reaffirmed that for absent class members " 'relief under the UCL is available without individualized proof of deception, reliance and injury.' " (*Pfizer,* at p. 631, quoting *Tobacco II, supra,* 46 Cal.4th at p. 320.) But the *Pfizer* court then stated: *"Be that as it may, one who was not exposed to the alleged misrepresentations and therefore could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution.* [¶] . . . [T]he class certified by the trial court, i.e., all purchasers of Listerine in California during a six-month period, is grossly overbroad because many class members, if not most, clearly are not entitled to restitutionary disgorgement. The record reflects that of 34 different Listerine mouthwash bottles, 19 never included any label that made any statement comparing Listerine mouthwash to floss. Further, even as to those . . . , not every bottle shipped . . . bore such a label. . . . Thus, perhaps the majority of class members who purchased Listerine during the pertinent six-month period did so not because of any exposure to Pfizer's allegedly deceptive conduct . . . . [¶] . . . *Tobacco II* allows a class representative who actually relied on the defendants' misleading advertising campaign to represent other class members who may have lost money by means of the unfair practice. *Tobacco II* does not stand for the proposition that a consumer who was never exposed to an alleged false or misleading advertising or promotional campaign is entitled to restitution." (*Pfizer,* at pp. 631–632, italics added.)

The *Pfizer* court thus held that the certified class, consisting of all purchasers of Listerine in California over a six-month period, was overbroad because the trial court improperly presumed the existence of a classwide injury. (*Pfizer, supra,* 182 Cal.App.4th at pp. 632–633.) The court reasoned that as to the "large numbers of class members [who] were *never exposed* to the 'as effective as floss' labels or television commercials[,] . . . there is absolutely no likelihood they were deceived by the alleged false or misleading advertising or promotional campaign. Such persons cannot meet the standard of section 17203 of having money restored to them because it 'may have been acquired by means of' the unfair practice. In the language of section 17203, with respect to perhaps a majority of class members, there is no doubt Pfizer did not obtain any money by means of the alleged UCL violation." (*Ibid.*) The California Supreme Court later denied the plaintiff's petition for review.

We agree with the *Pfizer* court's reasoning and conclude it applies with equal force in this case. As in *Pfizer*, a majority of the class members were *"never exposed"* to the alleged misrepresentation. (*Pfizer, supra*, 182 Cal.App.4th at p. 632.) Thus, as in *Pfizer*, "there is absolutely no likelihood they were deceived by the alleged false or misleading advertising . . . . Such persons cannot meet the standard of section 17203 of having money restored to them because it 'may have been acquired by means of' the [fraudulent or] unfair practice. In the language of section 17203, with respect to . . . a majority of [the] class members, there is no doubt [Target] did not obtain any money by means of the alleged UCL violation." (*Id.* at pp. 632–633.)

In this regard, this case's facts are materially different from the facts in *Tobacco II* and the two subsequent Court of Appeal decisions upon which Sevidal relies. (See *Tobacco II, supra*, 46 Cal.4th 298; *Weinstat v. Dentsply Internat., Inc.* (2010) 180 Cal.App.4th 1213 [103 Cal.Rptr.3d 614] (*Weinstat*); *Steroid Hormone Product Cases* (2010) 181 Cal.App.4th 145 [104 Cal.Rptr.3d 329] (*Steroid Hormone*).)

In *Tobacco II*, the plaintiffs alleged the defendants violated the UCL and FAL by conducting a decades-long campaign of deceptive advertising and misleading statements about the addictive nature of nicotine, and the proposed class "consist[ed] of members of the public *who were exposed to*" these advertisements and statements and were consumers of defendants' products. (*Tobacco II, supra*, 46 Cal.4th at p. 324, italics added.) Thus, unlike here, the proposed class included only those who were allegedly exposed to the alleged fraud.

In *Weinstat*, the plaintiffs alleged each product sold by the defendant contained written directions misrepresenting the safe use of the product. (*Weinstat, supra*, 180 Cal.App.4th at pp. 1219–1220.) Thus, each consumer of the product was exposed to the misrepresentation. Moreover, in reversing the denial of class certification on the UCL and breach of warranty claims, the *Weinstat* court focused primarily on the reliance issue, and did not specifically consider section 17203's "may have been acquired" statutory language. (See *Weinstat, supra*, at pp. 1222–1235.) A case is not authority for a proposition not considered. (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 415 [14 Cal.Rptr.2d 470, 841 P.2d 990].)

In *Steroid Hormone, supra*, 181 Cal.App.4th 145, the proposed UCL class consisted of individuals who allegedly purchased a nutritional supplement containing a controlled substance, and none of these class members had been informed the product contained this substance. (181 Cal.App.4th at p. 150.) Ruling before *Tobacco II* was filed, the trial court refused to certify the class because, even though the defendant may have been legally required to

disclose this information, individual questions predominated on the reliance and injury elements. (*Steroid Hormone*, at p. 155.) The reviewing court reversed, noting that, under *Tobacco II*, there is no injury or reliance requirement for absent class members. (*Steroid Hormone*, at p. 154.) The court further held a common legal issue among class members was the amount of money the defendant " 'may have . . . acquired by means of' " those illegal sales. (*Id.* at pp. 154–155.)

In this case, there was no similar allegation that Target was legally required to inform consumers of the product origin information. Although Sevidal alleged a false " 'Made in U.S.A.' " representation violates a statute (§ 17533.7; see fn. 6, *ante*), he has not cited to any legal requirement that a retailer must inform consumers of the country-of-origin information before they purchase an item. Thus, unlike in *Steroid Hormone*, the fact that the consumers did not learn of this information was not a basis to conclude Target was required to disgorge profits from the sales to every consumer, regardless whether the consumer was ever exposed to the alleged misrepresentation.

Sevidal's reliance on the *Tobacco II* court's discussion of *Collins v. Safeway Stores, Inc.* (1986) 187 Cal.App.3d 62 [231 Cal.Rptr. 638] is also misplaced. In *Collins*, the class representatives bought eggs produced by the defendant egg producer and sold by the defendant supermarket chain. Some of the eggs had been contaminated by a pesticide. (*Id.* at pp. 65–66.) The contaminated eggs were mixed in with uncontaminated eggs and, once the contamination was known, all cartons from the producer were pulled from the supermarket chain's shelves and destroyed. (*Ibid.*) The trial court declined to certify a class of individuals who purchased eggs from the supermarket during a five-month period and were not injured, finding the class was not ascertainable because there was no way of knowing which eggs were defective and thus whether these consumers purchased a defective product. (*Id.* at p. 67.) The appellate court agreed with this reasoning and affirmed. (*Id.* at pp. 69–70.)

The *Tobacco II* court found the Court of Appeal's holding in *Collins* to be "questionable" on the issue of the class members' right to recover on the UCL claim. (*Tobacco II, supra*, 46 Cal.4th at p. 322.) The *Tobacco II* court stated that "[i]t is clear in *Collins* that some of the purchasers in question may have purchased contaminated eggs—therefore, the 'money or property' of the entire class of purchasers 'may have been acquired by means' of an unfair practice (§ 17203), thus entitling them to restitution for their loss." (*Id.* at pp. 322–323.)

This discussion does not undermine our conclusion that Sevidal's proposed class is overbroad because most class members never selected the " 'Additional Info' " icon. In *Collins*, the unfair and unlawful act did not involve an alleged fraudulent representation; rather it concerned primarily an illegal and improper business practice of selling eggs that had been contaminated with pesticide, and then mixing those eggs with uncontaminated eggs. Under these circumstances and in the context of a UCL claim, the *Tobacco II* court suggested it did not matter whether each class member had bought eggs that were contaminated or incurred actual injuries resulting from the wrongful conduct (contaminating eggs with harmful pesticide); it was sufficient for class certification purposes that the defendant had acquired money (the amounts paid for all of the eggs) by means of the unlawful practice (using harmful pesticide). By contrast, in this case there is no basis for concluding that Target improperly acquired any money or property from consumers who purchased goods without having any exposure to misinformation concerning the country of origin of the Target products. Although Sevidal alleges Target committed an "unlawful" act, the essence of this allegation is based on an alleged false misrepresentation to which the majority of class members were never exposed.

### B. *CLRA and Fraud Claims*

On appeal Sevidal also contends the court erred in denying class certification on his fraudulent concealment and CLRA claims, but he does not state the factual basis for this assertion or develop any legal argument on these points. Thus, he has waived any challenge with respect to these claims. (See *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2 [87 Cal.Rptr.2d 654, 981 P.2d 499].)

Even if we were to reach the issues on the merits, we would find no error.

 Reliance is an essential element of a fraudulent concealment claim. (See *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 329 [40 Cal.Rptr.3d 313].) Thus, to recover, each unnamed class member would be required to prove individual reliance on Target's false country-of-origin designation. The court thus did not abuse its discretion in concluding the class action procedure was unsuitable on the fraud claim because Target's liability to each class member would have to be individually determined, and most class members would have no right to recover because they did not view the representation and thus could not have relied on the misrepresentations. To the extent reliance may be presumed if the representations would be material to a reasonable person (see *Tobacco II, supra*, 46 Cal.4th at p. 326), Sevidal presented no evidence or argument to support this claim.

■ We likewise conclude the court did not err in finding the class was overbroad with respect to Sevidal's CLRA claim. The CLRA makes unlawful various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." (Civ. Code, § 1770, subd. (a).) However, it is well settled that "to obtain relief under the CLRA, both the named plaintiff and unnamed class members must have suffered some damage *caused by* a practice deemed unlawful under Civil Code section 1770." (*Steroid Hormone, supra*, 181 Cal.App.4th at p. 156, italics added.) Because the majority of unnamed class members did not view the alleged misrepresentation, they could not satisfy this causation element of the CLRA claim.

## DISPOSITION

Judgment affirmed. Appellant to pay respondent's costs on appeal.

Huffman, Acting P. J., and Nares, J., concurred.