Filed 7/17/13  Almaraz v. Sharp HealthCare CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| JUAN MARCOS ALMARAZ et al., | D059648 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2007-00069288-CU-MC-CTL) |
| SHARP HEALTHCARE et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Ronald S. Prager, Judge.  Affirmed.

Gilbert & Sackman, Robert A. Cantore and Scott G. Miller for Plaintiffs and Appellants.

Littler Mendelson, Theodore R. Scott and Jody A. Landry for Defendants and Respondents.

Before us for a second time is a proposed class action brought by Juan Marcos Almaraz, Susan K. Bowers, Ruth Donley, Carolyn M. Hitchin, Beth Hurley, Kurt Kalker,

Lois K. Klepin and Maureen C. Schickler (Plaintiffs), alleging violations of state wage and hour laws against Sharp HealthCare, Grossmont Hospital Corporation, Sharp Chula Vista Medical Center, Sharp Memorial Hospital and Sharp Coronado Hospital and Healthcare Center (collectively "Sharp") on behalf of a proposed class comprised of Sharp's registered nurses (RN's). When this action was originally before us in 2010, we reversed the trial court's order denying class certification and remanded with instructions that the trial court reconsider the class certification motion to address additional theories of liability asserted by Plaintiffs.[1] On remand, the trial court reconsidered and denied the motion for class certification, and Plaintiffs now appeal from that order.

As we will explain, we conclude that the trial court was within its discretion to deny the motion for class certification, and we accordingly affirm the trial court's order.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Allegations of the Complaint*

As set forth in the 2010 opinion, Plaintiffs are RN's who work or worked at health care facilities operated by Sharp. In June 2007, Plaintiffs filed a class action complaint on behalf of a proposed class defined as "[a]ll non-exempt [RN's] currently or formerly employed by Sharp HealthCare in the County of San Diego at one of its affiliated health

---

[1]     Our previous opinion in this matter was *Almaraz v. Sharp HealthCare*, D055739 (Nov. 16, 2010) [nonpub. opn.] (the 2010 opinion).

care institutions on or after June 28, 2003." The complaint contained four causes of action.

The first cause of action alleged that Sharp had failed to pay wages for all time worked in violation of Labor Code sections 204 and 1194. Specifically, the complaint alleged that (1) RN's were not paid for time worked before or after scheduled shifts; and (2) that although RN's worked through meal periods, half-hour meal periods were deducted from their wages.

The second cause of action alleged that Sharp failed to provide RN's with 30-minute meal periods relieved of all duties, in violation of Labor Code section 226.7 and section 11 of Industrial Welfare Commission Wage Order No. 5-2001 (see Cal. Code Regs., tit. 8, § 11050, subd. 11).[2]

---

[2] Labor Code section 226.7 provides: "(a) No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission. [¶] (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided."

"The Industrial Welfare Commission [(IWC)] . . . is the state agency empowered to formulate wage orders governing employment in California." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1102, fn. 4.) With respect to meal periods, the applicable wage order provides in relevant part: "(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked. An 'on duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The

The third cause of action alleged that Sharp failed to provide RN's with 10-minute rest periods relieved of all duties in violation of Labor Code section 226.7 and section 12 of Industrial Welfare Commission Wage Order No. 5-2001 (Cal. Code Regs., tit. 8, § 11050, subd. 12).

The fourth cause of action alleged a violation of the unfair competition law (Bus. & Prof. Code, §§ 17200-17209) (the UCL) premised on Sharp's alleged violations of the state wage and hour laws.

B.      *The Original Class Certification Motion and Our 2010 Opinion*

Plaintiffs filed their original motion for class certification in April 2009. As we explained in the 2010 opinion, Plaintiffs' class certification motion was unfocused, and thus did not clearly and logically set forth the basis for Plaintiffs' claim that — despite Sharp's stated policies — RN's did not in fact receive required rest and meal periods or the appropriate compensation in lieu of those meal and break periods. In opposing class

---

written agreement shall state that the employee may, in writing, revoke the agreement at any time. [¶] (B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided." (Cal. Code Regs., tit. 8, § 11050, subd. 11(A)-(B).) Specifically with respect to health care workers, the wage order provides: "(D) Notwithstanding any other provision of this order, employees in the health care industry who work shifts in excess of eight (8) total hours in a workday may voluntarily waive their right to one of their two meal periods. In order to be valid, any such waiver must be documented in a written agreement that is voluntarily signed by both the employee and the employer. The employee may revoke the waiver at any time by providing the employer at least one (1) day's written notice. The employee shall be fully compensated for all working time, including any on-the-job meal period, while such a waiver is in effect." (Cal. Code Regs., tit. 8, § 11050, subd. 11(D).)

4

certification, Sharp correctly observed that Plaintiffs' allegations were difficult to understand, but it attempted to summarize those allegations as follows:

"Sharp admits finding it difficult to ascertain from Plaintiffs['] [memorandum of points and authorities] the basis for Plaintiffs' contention that the meal/rest period and off the clock claims of all [RN's] can be resolved through common proof. . . . That being said, it appears that Plaintiffs' primary theory is that [RN's] are denied meal/rest periods because their Units will be out of compliance with staffing ratios if they take them ('Ratio Theory'). Secondarily, Plaintiffs appear to contend that [RN's] working 12[-]hour shifts do not understand that they are entitled to three 10[-]minute breaks per shift and therefore are denied a third break every day they work ('Confusion Theory'), and that [RN's] do not put down all time worked on their timecards and do not record NB even when they do not get meal/rest periods, because they have been intimidated into not doing so by their supervisors ('Coercion Theory')."

In the 2010 opinion, we adopted the terms "Ratio Theory," "Confusion Theory" and "Coercion Theory" to describe Plaintiffs' theories of liability.

In ruling on the original motion for class certification, the trial court discussed the Ratio Theory, Confusion Theory and Coercion Theory, and decided that none of them were appropriate for class treatment because common questions of law and fact did not predominate and because Plaintiffs had not met their burden to show that the case could be managed on a class basis. As relevant to the issues we will discuss below, the trial court explained that common questions of law and fact did not predominate for the Confusion Theory because it was "based on generalized assumptions which are premised upon subjective analysis of each individual's state of mind." The trial court stated, "Furthermore, there is likely a lack of any substantial commonality since there are over 100 different managers with various hospitals/facilities. An analysis of the states of mind of nurses deposed has led this Court to conclude that Plaintiffs have not met their burden

5

of presenting substantial evidence to support these theories. There is a complete lack of consensus covering a broad range of highly individualized responses with respect to meal and rest breaks. . . . Where coercion and confusion is claimed, the responses are highly subjective and would require individualized examination to reconcile the disparities on the time card, prepared while the information was fresh in each nurse['s] mind. Also, each nurse would have to explain his or her departure from legal requirements." The trial court separately explained that Plaintiffs had failed to meet their burden to establish that the case would be manageable as a class action in light of the fact that "[t]hey have lumped together approximately 3[,]900 nurses working for over 100 managers in 164 units."

In the 2010 opinion, we did not specifically address whether the trial court was within its discretion to decide that the Ratio Theory, Confusion Theory and Coercion Theory were inappropriate for class treatment. Instead, we concluded that the trial court abused its discretion because it had not considered whether class treatment was appropriate as to two *additional* theories of liability that Plaintiffs described in their briefing of the motion for class certification and were consistent with the allegations of Plaintiffs' complaint. Those theories were (1) the claim that Sharp acted unlawfully in requiring that RN's working over eight hours agree to sign forms waiving either their first or second meal period; (2) the claim that RN's were not receiving appropriate overtime

6

pay for educational, training and orientation activities designated by the code "EDUC."[3]

We remanded "for the trial court to reconsider the motion, taking into account Plaintiffs' additional theories of liability, as expressed in their class certification motion, premised on (1) the meal waiver forms, and (2) the failure to pay overtime for activities coded as 'EDUC.'" For the benefit of the trial court on remand, the 2010 opinion also addressed Plaintiffs' challenge to several evidentiary rulings made by the trial court, concluding that most of the challenged rulings were proper, with the exception of the trial court's exclusion of certain statements in the Plaintiffs' declarations.

C.      *Proceedings on Remand*

On remand, the parties entered into a stipulation regarding the scope of the trial court proceedings required by the 2010 opinion, which stated that "[t]he parties agree that the Court is to reconsider Plaintiff's motion for class certification taking into account every theory of liability advanced by Plaintiffs, including Plaintiffs' two additional theories of liability . . ." (i.e., the EDUC/Overtime Theory and Meal Waiver Theory), and "taking into account all admissible evidence."

Plaintiffs then filed a memorandum of points and authorities in support of a "reconsidered motion for class certification" (Plaintiffs' reconsidered motion). Although Plaintiffs' reconsidered motion is somewhat unfocused, it discusses the EDUC/Overtime

---

3      In their briefing of the current appeal, Plaintiffs have referred to these theories as the "EDUC/Overtime Theory" and the "Meal Waiver Theory." We will follow the same convention.

7

Theory, the Meal Waiver Theory, and the complaint's UCL cause of action, arguing that those theories are suitable for class treatment.[4]

Plaintiffs' reconsidered motion clarified that the Meal Waiver Theory was based on the allegation that the IWC lacked the authority to issue section 11(D) of Wage Order No. 5, which states that employees in the healthcare industry "who work shifts in excess of eight (8) total hours in a workday may voluntarily waive their right to one of their two meal periods." (*Ibid*.) According to Plaintiffs, section 11(D) of Wage Order No. 5 is void because it conflicts with Labor Code section 512, subdivision (a), which provides that "if the total work period per day of the employee *is no more than six hours*, the meal period may be waived by mutual consent of both the employer and employee." (*Ibid*.)

Plaintiffs' reconsidered motion also argued that despite the trial court's prior decision that class treatment was not appropriate for the Confusion Theory, the court should certify a class as to the UCL cause of action based on a similar concept as the Confusion Theory. Plaintiffs argued that class certification was proper as to what it refers to in its appellate briefing as a "Confusion Theory *through a UCL lens*" on the purported basis that — in a claim brought under the UCL — "proof of an unlawfully deceptive practice as to one class member allows an inference of reliance as to all," limiting the number of individual issues that would have to be decided.

---

[4] Plaintiffs explain in their appellate briefing that on "remand, Plaintiffs abandoned their Ratio and Coercion Theories."

Regarding the EDUC/Overtime Theory, Plaintiffs' reconsidered motion stated that although the trial court had excluded evidence relating to that theory in ruling on the original class certification motion, Plaintiffs proposed to provide "additional evidence" on that issue in connection with the reconsidered motion. However, as Sharp pointed out in its opposition, that "additional evidence" was the same evidence that the trial court has already excluded in connection with the original class certification motion.

In a lengthy minute order, the trial court denied Plaintiffs' reconsidered motion. After thoroughly and accurately setting forth the legal standards governing class certification, the trial court separately discussed whether class treatment was appropriate for the three different theories of liability covered in Plaintiffs' reconsidered motion.

As to the "Confusion Theory through a UCL lens,"[5] the trial court noted that the UCL theory was *not* one of the two theories that the 2010 opinion instructed it to consider on remand, and it pointed out that Plaintiffs had cited no persuasive authority to support their argument that the trial court should consider new theories of liability. However, the trial court nevertheless reached the merits of whether the Confusion Theory through a UCL lens was suitable for class treatment. The trial court concluded that based on "admissible evidence presented to the court, . . . Plaintiff failed to establish a certifiable

_____

[5] The trial court did not employ this phrase to describe Plaintiffs' new theory of liability under the UCL, as it was used by Plaintiffs for the first time in their appellate briefing. We use the term here because it is a good description of Plaintiffs' theory, and in shorthand we will refer to the theory as the "UCL Theory."

9

class" based on that theory, or any of "the theories presented in the original motion or theories that may be derived from said theories."

In addressing the Meal Waiver Theory, the trial court set forth alternative bases for denying class certification. First, it determined that the Meal Waiver Theory failed on the merits because Labor Code section 512, subdivision (b) "specifically authorized [the IWC] to enact an exception to the general requirements of section 512, subd[ivision] (a)." The trial court also explained that "[e]ven if the Court were to consider the IWC's wage order invalid, Plaintiffs still failed to establish the prerequisites of ascertainability, commonality, and typicality . . . ." Specifically, the court stated that (1) the class was overbroad and unascertainable because the "parties agree that waiver forms do not apply to approximately 30 percent of the RN[']s"; (2) individual issues would predominate because establishing whether a class member was harmed would require an individualized inquiry into whether the RN's self-scheduled their meals or already received a premium payment for a specific day of work by including the "NB" code on their timecards; and (3) Plaintiffs had not established the manageability of litigating the Meal Waiver Theory as a class action, in that Plaintiffs did not put forth a specific trial plan and instead "merely informed the Court of tools it <u>may</u> use to test the viability of their theories." (Italics omitted, underscoring added.)

With respect to the EDUC/Overtime Theory, the trial court explained that because Plaintiffs had submitted *no* admissible evidence regarding that theory, the court had no basis for concluding that any of the requirements for class treatment had been met.

10

II

DISCUSSION

A.  *Applicable Legal Standards*

The legal standards that we set forth in the 2010 opinion continue to apply, and we restate them here.

1.  *Standard of Review for Challenge to Order Denying Class Certification*

"[T]rial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action" and are accordingly "afforded great discretion in granting or denying certification."  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (*Linder*) 435.)  We thus apply an abuse of discretion standard of review to an order denying class certification.  (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On*).)  "A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions."  (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 (*Fireside*).)  "Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal '"even though there may be substantial evidence to support the court's order."'  [Citations.]  Accordingly, we must examine the trial court's reasons for denying class certification.  'Any valid pertinent reason stated will be sufficient to uphold the order.'"  (*Linder*, at p. 436.)

2.  *Requirements for Class Certification*

"Section 382 of the Code of Civil Procedure authorizes class suits in California when 'the question is one of a common or general interest, of many persons, or when the

11

parties are numerous, and it is impracticable to bring them all before the court.'" (*Linder*, *supra*, 23 Cal.4th at p. 435.) "Class certification requires proof (1) of a sufficiently numerous, ascertainable class, (2) of a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods." (*Fireside*, *supra*, 40 Cal.4th at p. 1089.) "The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members." (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Ibid*.)

The requirement that common questions of law and fact predominate "'means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants."'" (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108.)

The concept of manageability arises under the issue of whether a class action is superior to individual lawsuits. "[E]ven if questions of law or fact predominate, the lack of superiority provides an alternative ground to deny class certification. [¶] . . . [¶] In deciding whether a class action would be superior to individual lawsuits, 'the court will

12

usually consider [four factors]: [¶] [(1)] The interest of each member in controlling his or her own case personally; [¶] [(2)] *The difficulties, if any, that are likely to be encountered in managing a class action*; [¶] [(3)] The nature and extent of any litigation by individual class members already in progress involving the same controversy; [and] [¶] [(4)] The desirability of consolidating all claims in a single action before a single court.'" (*Basurco v. 21st Century Ins. Co.* (2003) 108 Cal.App.4th 110, 120-121, italics added (*Basurco*).) As our Supreme Court has commented, the proponent's burden of establishing the propriety of class certification "clearly contemplates a demonstration of predominance *and manageability*." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922, italics added (*Washington Mutual*).)

B.     *The Trial Court Did Not Refuse to Consider the UCL Theory*

Plaintiffs' first contention is that the trial court abused its discretion because it improperly refused to consider whether class treatment was proper for the UCL Theory. According to Plaintiffs, the court refused to consider that issue because it decided, as a preliminary matter, that the scope of the issues specified for remand in the 2010 opinion did not include whether the class certification motion should be granted as to the UCL Theory.

Plaintiffs' argument is easily rejected because its factual premise is faulty. As we have described, the trial court did *not* refuse to consider whether class treatment was appropriate for the UCL Theory. Instead, as an alternative basis for its ruling, the trial court reached the merits of the class certification issue and stated that Plaintiffs had failed to establish a certifiable class. Therefore, we reject Plaintiffs' contention that the trial

13

court erred by refusing to consider the merits of whether the UCL theory provided a suitable basis for class certification.[6]

C.       *The Trial Court Properly Refused to Consider the Evidence It Had Already Ruled Inadmissible to the Extent the 2010 Opinion Affirmed Those Rulings*

Plaintiffs next take issue with the trial court's refusal to consider certain evidence when ruling on Plaintiffs' reconsidered motion for class certification.

As background to this issue, as we explained in the 2010 opinion, the trial court either struck or ruled inadmissible a significant portion of the evidence that Plaintiffs attempted to rely on to support the class certification motion.  With respect to the evidence Plaintiffs submitted with their moving papers, the trial court excluded — among other things — several paragraphs of the declarations of two of Plaintiffs' expert witnesses and some of the paragraphs of the declarations filed by the named plaintiffs. Along with their reply memorandum, Plaintiffs attempted to file a supplemental declaration signed by their attorney, which attached 37 exhibits including the full transcripts from recently taken depositions of 10 RN's and over 600 pages of timecards and payroll reports from putative class members purporting to show "various categories of wage and hour violations."  With the exception of certain impeachment evidence, the trial court granted Sharp's motion to strike the supplemental evidence that Plaintiffs

---

[6]       Because the trial court did consider the merits of whether the UCL Theory was appropriate for class treatment, we need not, and do not, address Plaintiffs' contention that the trial court should have considered the UCL Theory on the ground that on remand the trial court was required to " 'consider afresh' " whether Plaintiffs satisfied the class action requirements on any theory, even those not explicitly set forth in our directions to the trial court in the 2010 opinion.

14

submitted with their reply memorandum. The 2010 opinion closely analyzed Plaintiffs' challenges to the trial court's evidentiary rulings, affirming all of them except for rulings excluding some of the paragraphs of the named plaintiffs' declarations.

In its ruling on Plaintiffs' reconsidered motion, the trial court explained that it would not revisit its evidentiary rulings made in connection with its original ruling on the motion for class certification. The trial court specifically rejected Plaintiffs' argument that the stricken evidence previously submitted with the reply memorandum should now be admitted because it was being submitted as part of the *initial* moving papers for Plaintiffs' reconsidered motion. As the trial court explained, "The Court of Appeal recognized the relevance of the evidentiary issues raised by Plaintiffs on remand . . . and did a careful analysis of this Court's rulings. Plaintiffs' assertion that it may present evidence that this Court and the Court of Appeal found to be objectionable in this reconsidered motion to support their theories, i.e., evidence presented with the reply brief, disregards the Court of Appeal's recognition of the relevance of these rulings on remand and does not square with the time and attention that the Court of Appeal spent on the evidentiary aspect of the class certification motion."

We agree with the trial court. In the 2010 opinion we directed the trial court to review the motion for class certification that Plaintiffs had *already* filed, with an explicit focus on the Meal Waiver Theory and EDUC/Overtime Theory. As the trial court correctly observed, we extensively discussed the evidentiary challenges raised by Plaintiffs in the 2010 appeal — including Plaintiffs' challenge to the exclusion of the evidence they filed with the reply memorandum — because we intended those

15

evidentiary rulings to remain in place during the trial court's reconsideration of the class

certification motion. Plaintiffs' request that the trial court consider evidence that it

already ruled inadmissible is contrary to our instructions in the 2010 opinion.

In addition to contending that the trial court should have admitted the previously

excluded evidence, Plaintiffs argue that the excluded evidence concerning the

EDUC/Overtime Theory still should have played some role in the trial court's analysis of

whether that theory was appropriate for class certification.

As an initial matter, we note that the trial court's refusal to consider the evidence

relating to the EDUC/Overtime Theory had a profound impact on Plaintiffs' case because

the trial court's evidentiary rulings resulted in the exclusion of *all* of the evidence relating

to whether class treatment was appropriate for the EDUC/Overtime Theory. Based on

the complete lack of evidentiary support, the trial court concluded in ruling on Plaintiffs'

reconsidered motion, that Plaintiffs had not met their burden with respect to the

EDUC/Overtime Theory to establish the requirements for class certification.

Focusing first on the evidence on the EDUC/Overtime Theory submitted with

their moving papers for the class certification motion, Plaintiffs acknowledge that the

trial court *sustained* Sharp's objections to the declaration and attached exhibit submitted

by Plaintiffs' counsel, Robert Cantore. However, Plaintiffs argue that the trial court still

should have *considered* that declaration and attached exhibit when deciding the class

certification motion, *even though* they were technically excluded from evidence.[7]

Plaintiffs argue that although "the attorney's declaration was stricken as evidence . . . , that does not mean that the declaration should not have been considered" to show that Cantore "had discovered evidence . . supporting Plaintiffs' EDUC/Overtime Theory . . . in Sharp's own payroll records." Next, focusing on the evidence on the EDUC/Overtime Theory submitted with the reply memorandum, Plaintiffs argue that even though it was stricken, that evidence nevertheless "should have been considered in assessing *not* whether Plaintiffs' claims have merit but whether they were *susceptible to class treatment*."

The argument is nonsensical and we reject it. The point of the class certification motion was for Plaintiffs to establish that the requirements for class certification existed for the EDUC/Overtime claims and their other theories of liability. Plaintiffs submitted the evidence for that purpose, and the trial court excluded it. Plaintiffs have cited no authority, and we are aware of none, that would allow the court to consider excluded evidence for the limited purpose of ruling on a class certification motion. Without any

---

[7] Paragraph 6 of the declaration of Robert A. Cantore stated, "In addition to assembling documents and deposition transcripts, I also caused paralegals from my office to review the time cards produced by Defendants for the named plaintiffs. Attached hereto as Exhibit 3 is a true and correct copy of [a] spreadsheet prepared by my firm's paralegals showing how Defendants' systemwide Payroll Department incorrectly denied or miscalculated overtime compensation, often more than 50 percent of the time, in instances when the systemwide payroll code EDUC was applied to training, education, orientation or meetings recorded on the [*sic*] seven of the eight Plaintiffs' time cards." The trial court sustained Sharp's objection to that paragraph for lack of personal knowledge and to exhibit 3 referred to therein. Plaintiffs did not challenge that evidentiary ruling in their first appeal, and they do not challenge it now.

17

admissible evidence supporting its claim that each of the requirements for class certification existed for the EDUC/Overtime Theory of liability, the trial court properly denied class certification.

D.     *The Trial Court Was Within Its Discretion to Conclude That the Class Was Overbroad with Respect to the Meal Waiver Theory*

As one of the alternative bases for denying class certification on the Meal Waiver Theory, the trial court stated that "the class as defined is overbroad" because the parties agreed that "the waiver forms do not apply to approximately 30 percent of the RN[']s since they do not work shifts in excess of 10 hours."  As the trial court explained, "[a] class cannot be certified when a proposed class is overbroad because a substantial portion of the class were never subjected to or damaged by the asserted illegal practice[,]" and "[a]s a result the class is unascertainable."  Plaintiffs contend that the trial court's ruling on this issue was an abuse of discretion.  As we will explain, we disagree.

As an initial matter, we discuss the concept of overbreadth and ascertainability as it applies in class certification motions.  As we have explained, "[t]he party seeking certification has the burden to establish the existence of . . . an ascertainable class . . . ." (*Sav-On*, *supra*, 34 Cal.4th at p. 326.)  For a proposed class to be ascertainable, (1) the class definition must state precise and objective criteria that allow identification of persons who have claims and will be bound by the results of the litigation (*Marler v. E.M. Johansing, LLC* (2011) 199 Cal.App.4th 1450, 1459; *Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 101; *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836, 858); and (2) there must be a way to identify those

18

persons and give them notice of the litigation without undue expense or time, usually by reference to official or business records (*Archer v. United Rentals, Inc.* (2011) 195 Cal.App.4th 807, 828; *Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 919 (*Sevidal*)).  "Courts have recognized that 'class certification can be denied for lack of ascertainability when [(1)] the proposed definition is overbroad and [(2)] the plaintiff offers no means by which only those class members who have claims can be [separated] from those who should not be included in the class.'"  (*Sevidal*, at p. 921.)

Here, the proposed class encompasses *all* non-exempt RN's employed by Sharp or its affiliates since June 28, 2003.  As the trial court observed, approximately 30 percent of the RN's could not have been harmed by Sharp's use of meal waivers because they did not work shifts over 10 hours.[8]  On that basis, the trial court determined that the class was overbroad and therefore unascertainable.  We agree.  By broadly including all of Sharp's nonexempt RN's in the class — even the 30 percent who suffered no harm — the class definition did not describe "an identifiable group *that was harmed by the defendant*" (*Akkerman v. Mecta Corp., Inc.* (2007) 152 Cal.App.4th 1094, 1100, italics added), or "'a set of common characteristics sufficient to allow a member of [the proposed class] to

---

8      Plaintiffs state in their reply brief that they are not completely in agreement with the trial court's statement that waiver forms do not apply to the approximate 30 percent of RN's because those RN's work shifts shorter than 10 hours.  Plaintiffs state that some of those RN's may have worked longer shifts at *other* times during the class period although they do not currently work a shift of that length.  However, Plaintiffs state they are not able to estimate how many RN's would be in that position and would need to conduct further discovery on the issue.

19

identify himself or herself *as having a right to recover based on the description*.'" (*Sevidal*, *supra*, 189 Cal.App.4th at p. 920, italics added.)

Plaintiffs contend that 30 percent is not a significant percentage of class members for the purpose of an ascertainability and overbreadth analysis. Plaintiffs rely on cases in which a class was determined to be overbroad when *more than half* of the class did not suffer injury. (*Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 632 [in a case alleging deceptive advertising, the class was overbroad when "many, *if not most*, class members were not exposed" to the allegedly deceptive advertising campaign (italics added)]; *Sevidal*, *supra*, 189 Cal.App.4th at p. 921 [in a case alleging false advertising and similar claims, the class was overbroad when "approximately 80 percent" of the class members were never exposed to the alleged misrepresentation].) In our view *Sevidal* and *Pfizer* present outlying factual scenarios and do not stand for the general principle that a trial court lacks discretion to determine that a class is overbroad *unless* more than half of the class members suffered no harm. Instead of asking whether a *majority* of the class members lacked any injury, the more sensible inquiry is set forth in *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 743, where the court inquired whether the unharmed class members represented only a "marginal element" in the class. *Bell* determined the class was not overbroad when a random sample showed that only 5.7 percent of the employees in the random sample lacked an interest in the objectives of the litigation. (*Ibid*.) Similarly, the standard applied in *Sevidal* was whether the percentage of class members without any injury was "significant" rather than "only slightly overinclusive." (*Sevidal*, at p. 921.) Here, the percentage of class members who

20

suffered no injury is nearly *one-third* of the entire class, which is far greater than a *marginal* 5.7 percent in *Bell*, and cannot reasonably be described as only *slightly* overinclusive, as stated in *Sevidal*.

Plaintiffs also contend that trial court's ascertainability analysis improperly ignored *Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208, which — like this case — concerned a proposed class action alleging that the employer violated the wage and hour laws by requiring employees to sign unlawful meal waiver forms. (*Id*. at p. 1198.) Plaintiffs argue that like in *Bufil*, the trial court should have concluded that although *some* class members may not have been impacted by the allegedly illegal meal waivers, the class is still ascertainable and not overbroad. We reject Plaintiffs' argument because the class definition in *Bufil* was specifically designed to *eliminate* the problem of overbreadth by including only those employees whose time records showed them to be impacted by the allegedly illegal policy. (*Id*. at p. 1201.) Accordingly, the proposed class in *Bufil* was "by definition . . . ascertainable from [the employer's] records" because it specifically included *only* those employees who timesheet records show that they were injured by the employer's alleged illegal policy. (*Id*. at p. 1208.) Here, in contrast, Plaintiffs have not even *attempted* to define a class that would only include those RN's who were impacted by Sharp's meal waiver policy, and they further have not shown that it would even be *possible* to narrow the class using existing records. Instead — as the trial court correctly pointed out — Plaintiffs have proposed a grossly overbroad class that sweeps in *all* of Sharp's nonexempt RN's regardless of the fact that approximately 30 percent of them have not been impacted by Sharp's meal waiver policy.

21

E.      *The Trial Court Was Within Its Discretion to Determine That Plaintiffs Failed to Establish That the Case Would Be Manageable as a Class Action with Respect to the Meal Waiver Theory*

We next examine Plaintiffs' contention that the trial court abused its discretion in determining that the litigation of the Meal Waiver Theory would not be manageable as a class action.

As we have explained, in addition to establishing that common questions of law or fact predominate, to prevail on a class certification motion, a party must establish that "a class action would be superior to individual lawsuits," taking into account "'[t]he difficulties, if any, that are likely to be encountered in managing a class action.'" (*Basurco*, *supra*, 108 Cal.App.4th at p. 121.)  In Plaintiffs' reconsidered motion, Plaintiffs supplied only vague explanations of how the Meal Waiver Theory would be manageable as a class action.  Plaintiffs argued, "In the instant action, the Court may provisionally certify the class and one or more subclasses corresponding to each theory of recovery advanced by Plaintiffs, until it can be determined through examination of Sharp's records or random sampling or some combination thereof, whether sub-classes should be further sub-divided to account for differences between, say, RN[']s assigned to eight-hour and twelve-hours schedules.  In addition to subclasses, California courts have endorsed several other methods to manage individual issues and preserve the efficiencies of class treatment, including pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized practices."  When discussing manageability, Plaintiffs referred specifically to the Meal Waiver Theory only in a brief sentence:  "[T]he lawfulness of Sharp's systemwide late lunching,

22

meal waiver forms and EDUC payroll practices can be determined 'in the abstract,' i.e., as a matter of law with limited or no factual inquiry."  Although Plaintiffs acknowledged that for each theory "calculating damages . . . may require some individualized inquiry," they claimed — without providing specifics — that "these issues can nonetheless be resolved on the basis of Sharp's official records — above all, putative class members' time cards and payroll reports."

On appeal, Plaintiffs continue to fall back on their vague assertions about the manageability of the Meal Waiver Theory as a class action, without any citation to the record.  Plaintiffs state in their appellate brief that they "repeatedly have informed the trial court that they have examined some (albeit not all) of Sharp's records . . . and are currently satisfied they can provide their case (on each theory) using these records alone. Put simply, what else does the trial court want or need at the early stage of the litigation . . . ?"  Plaintiffs argue that because Sharp is required by federal law to maintain time records for its employees, the appropriate documentation for the classwide resolution of this case *must* exist in Sharp's files.  However, they fail to specifically explain exactly *what type* of documentation they would rely on to establish their case if it is litigated as a class action and *how* that documentation relates to the issues that would have to be resolved.

Based on Plaintiffs' deficient showing on the issue of manageability, the trial court stated that the Meal Waiver Theory would be inappropriate for class treatment because Plaintiffs had not established that procedural tools were available to make it manageable on a class basis.  As the trial court explained, "Instead of a specific plan, Plaintiffs merely

23

informed the Court of tools it may use to test the viability of their theories. This is not sufficient." (Italics omitted.) The trial court pointed out that issues particular to each class member could arise in litigating the Meal Waiver Theory, such as whether class members self-scheduled their meal periods, whether they already received a premium payment on a day they delayed their meal period, and whether they were one of the approximate 30 percent of class members who did not work long enough shifts to be impacted by the meal waivers. With reference to these issues, the trial court pointed out that it could not "assume, based only on Plaintiffs' counsel's assertion, that all can be known simply by referencing the time cards."[9]

We agree with the trial court that Plaintiffs have not met their burden to establish how this case can be managed as a class action with respect to the Meal Waiver Theory or any of their theories. Plaintiffs have provided nothing but vague assertions that they intend to rely on Sharp's employment records. They have made no attempt to explain what those records are or how those records can and will be used in the litigation. To prevail on a class certification motion, "[i]t is not sufficient . . . simply to mention a

_____

[9]    As we understand the trial court's comments, it was not rejecting any *specific* methodology that Plaintiffs were proposing to manage the litigation as a class action, and thus its decision on manageability did not touch on the issue currently before our Supreme Court regarding whether certain representative testimony and statistical evidence may be used as trial management strategies in a wage and hour class action. (*Duran v. U.S. Bank National Assn.* (May 16, 2012, S200923), granting review of *Duran v. U.S. Bank National Assn.* (2012) 203 Cal.App.4th 212; see also *Wal–Mart Stores, Inc. v. Dukes* (2011) 564 U.S. __ [131 S.Ct. 2541, 180 L.Ed.2d 374].) Instead, the trial court ruled that Plaintiffs had not met their burden to establish manageability precisely because they had not identified *any* approach to making this case manageable as a class action.

24

procedural tool; the party seeking class certification must explain how the procedure will effectively manage the issues in question . . . ." (*Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1432-1433.) As our Supreme Court has explained in the context of discussing the requirements for certification of a nationwide class, a trial court "cannot simply rely on counsel's assurances of manageability" and "cannot accept 'on faith'" the accuracy of counsel's assertions as to manageability. (*Washington Mutual*, *supra*, 24 Cal.4th at p. 924.) "[C]lass action proponents 'should not expect the court to ferret through, disseminate, and craft manageable schemes'" from the material provided by plaintiffs, because that "burden 'clearly rests' with the proponents." (*Id*. at pp. 924-925.)[10]

By failing to provide any specifics as to how they proposed to litigate the Meal Waiver Theory as a class action despite the issues requiring individual proof, Plaintiffs failed to meet their burden. Because Plaintiff provided only vague assurances that the litigation would be manageable as a class action, the trial court was well within its discretion to conclude Plaintiffs failed to meet their burden on that issue with respect to the Meal Waiver Theory.

---

[10] Further, although Plaintiffs vaguely suggested that subclasses could be created to help manage this litigation, a court need not consider the creation of subclasses when "plaintiffs failed to provide the trial court with a concrete proposal describing how such subclasses would be defined, how they would be administered, or how they would help the court deal with the complexities inherent in the proposed class." (*Block v. Major League Baseball* (1998) 65 Cal.App.4th 538, 545.)

F.      *Reversal Is Not Warranted on the Basis That the Trial Court Considered the Merits of the Meal Waiver Theory*

Relying on our Supreme Court's comment in *Fireside*, *supra*, 40 Cal.4th at page 1074, that "[t]rial courts in class action proceedings should decide whether a class is proper, and if so, order class notice before ruling on the substantive merits of an action," Plaintiffs argue that the trial court abused its discretion by considering the merits of the Meal Waiver Theory.

Our Supreme Court's view on whether the merits should be considered in ruling on a class action certification motion was recently clarified in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*).  *Brinker* stated that "any 'peek' a court takes into the merits at the certification stage must 'be limited to those aspects of the merits that affect the decisions essential' to class certification."  (*Id*. at p. 1024.) However, in this case, we need not decide whether the trial court's discussion of the merits of the Meal Waiver Theory was permissible under the rule expressed in *Brinker* because the trial court provided three *alternative* bases for its ruling denying class certification on the Meal Waiver Theory.

Specifically, as we have explained, apart from discussing the merits of the Meal Waiver Theory, the trial court decided that as to the Meal Waiver Theory (1) the class was overbroad and unascertainable; (2) individual issues would predominate; and (3) Plaintiffs had not established the manageability of litigating the Meal Waiver Theory as a class action.  We concluded above that Plaintiffs' challenge to two of the alternative bases for the trial court's ruling on the Meal Waiver Theory lack merit:  the class was

26

overbroad and the case was not manageable as a class action. Further, Plaintiffs present no argument challenging the remaining of the trial court's three alternative bases for denying class certification basis, namely, that individual issues predominate.

In our review of the trial court's class certification ruling, "'[a]ny valid pertinent reason stated will be sufficient to uphold the order.'" (*Linder*, *supra*, 23 Cal.4th at p. 436; see also *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 844 [reversal not warranted "simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order"].) Here, because the trial court gave three valid pertinent reasons other than its consideration of the merits, we reject Plaintiffs' argument that the trial court's order denying class certification should be reversed based on the court's consideration of the merits of the Meal Waiver Theory.[11]

---

[11] We note that Plaintiffs' reply brief raises several additional substantive issues that were not presented in the opening brief, all of which are premised on our Supreme Court's recent opinion in *Brinker*, *supra*, 53 Cal.4th 1004, issued after Plaintiffs filed their opening appellate brief. The basic argument in Plaintiffs' reply brief is that because of *Brinker*, "all of Plaintiffs' theories should be placed back before the trial court," even those that were not raised in the opening brief as a basis for the appeal, and even those that were not the subject of Plaintiffs' reconsidered motion. We have incorporated *Brinker* into our analysis to the extent it is relevant to the issues raised in Plaintiffs' opening brief, but we do not address any new substantive grounds for appeal that Plaintiffs raised for the first time in their reply brief. (See *Reichart v. Hoffman* (1997) 52 Cal.App.4th 754, 764; *People v. Zamudio* (2008) 43 Cal.4th 327, 353 ["Normally, a contention may not be raised for the first time in a reply brief."].)

Further, we note that Plaintiffs' opening brief contains several vague and undeveloped arguments that are either not set forth in the argument section of their brief or are not contained within the scope of their argument headings. We do not address those arguments as they are not properly presented. (*Alameida v. State Personnel Bd.* (2004) 120 Cal.App.4th 46, 59 ["We may disregard arguments not properly presented under appropriate headings."].)

DISPOSITION

The order denying class certification is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P.J.

AARON, J.